No. 22-1859

# United States Court of Appeals for the First Circuit

————

**RAFAEL ITHIER, EGC, CORP. a/k/a EL GRAN COMBO,**

PLAINTIFFS-APPELLEES

v.

**CARLOS JUAN APONTE-CRUZ, a/k/a Charlie Aponte**

DEFENDANT-APPELLANT

**JANE DOE; ABC INSURANCE COMPANY; COMPANY XYZ; RICHARD DOE; MARY ROE; CONJUGAL PARTNERSHIP APONTE-DOE; CONJUGAL PARTNERSHIP DOE-ROE,**

Defendants.

Appeal from the District Court
for the District of Puerto Rico

————

**BRIEF FOR PLAINTIFF-APPELLANT
CARLOS JUAN APONTE-CRUZ**

————

José A. Hernández Mayoral
250 Tetuán St. Floor 2
San Juan, Puerto Rico 00901
787-722-7782

*Counsel for Appellant*

# TABLE OF CONTENTS

I. JURISDICTIONAL STATEMENT ...................................................... 1

II. STATEMENT OF ISSUE PRESENTED FOR REVIEW ................................... 1

III. STATEMENT OF THE CASE .......................................................... 1

IV. SUMMARY OF THE ARGUMENT ................................................... 8

V. THE ARGUMENT ....................................................................... 9

    A.    Standard of review .................................................................. 9

    B.    The statutory language and royalty structure of 114(g)(2), as well as the legislative record and the interpretation by the entities that administer the statute, demonstrate that the artist royalties of a band do not belong to the band's owner, but to the band as a whole, whose members create the recorded sounds............................................. 10

    C.    The district court's conclusion that royalties under 114(g)(2)(D) belong to the band's owner and not the band as a whole leads to an absurd result. ....................................................................................... 20

    D. Aponte as lead singer is not a nonfeatured vocalist under 114(g)(2)(C) because that term refers to back-up vocalists hired ad hoc for sound recordings, not to regular band members........................................ 23

VI. CONCLUSION............................................................................ 28

# TABLE OF AUTHORITIES

**Cases**

*Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103 (1st Cir. 2001) .................. 9

*Kelly v. U.S.*, 924 F.2d 355 (1st Cir. 1991) ............................................................ 21

*KMart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ............................................... 21

*Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 37 F.4th 746 (1st Cir. 2022) ................................................. 9

*Recovery Group, Inc. v. C.I.R,* 652 F.3d 122 (1st Cir. 2011) ................................ 11

*Skidmore v. Swift Co.*, 323 U.S. 134  (1944) .............................................. 11, 12, 27

*SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41 (D.C. Cir. 2018) ..... 12

*SoundExchange, Inc. v. Muzak LLC*, 854 F.3d 713 (D.C. Cir. 2017) .................... 15

*South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91 (1st Cir. 2002) ....................... 27

*United States v. Kirby*, 74 U.S. 482 (1868)). .......................................................... 21

*United States v. Vidal-Reyes*, 562 F.3d 43 (1st Cir. 2009) .................................... 11

*Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E.,*  615 F.3d 45 (1st Cir. 2010) ................................................................................................. 9

**Statutes**

17 U.S.C §101 ......................................................................................................... 14

17 U.S.C §106 ......................................................................................................... 12

17 U.S.C. § 114(g) ............................................................................................ passim

28 U.S.C. § 1291 ....................................................................................................... 1

28 U.S.C. § 1338 ....................................................................................................... 1

## Rules

Fed.R.Civ.P. 56(a) ............................................................................ 10

## Regulations

37 C.F.R. § 261.4(c) ..................................................................... 3, 15

## Other Authorities

141 Cong. Rec. S11949 (1995) ......................................................... 19

2A Sands, *Sutherland Stat. Const.* § 45.12 (4th ed. 1984-85) ................ 21

Alasauskasa, Amanda, Comment, *Save Rock and Roll: A look at rights afforded to pre-1972 sound recordings and why federalization should be granted*, 66 DePaul L. Rev. 265 (2016) ................................................ 26

Digital Performance Right in Sound Recordings Act of 1995 (DPRA), Pub. L. No. 104-39, § 2, 109 Stat. 336 ................................................ 3, 13

Hughes, Justin and Mergesa, Robert P., *Copyright and Distributive Justice,* 92 Notre Dame L. Rev. 513, 534 (2016) ............................................ 26

Kronenberg, Sam , Note, *Royalty Rates and Exclusive Releases Threaten Music Streaming*, 27 S. Cal. Interdisc. L.J. 633 (2018) ......................... 26

Marshall, Rick, *The Quest for "Parity": an examination of the radio fairness act*, 60 J. Copyright Soc'y U.S.A. 445 (2013) .................................... 25

Mulraine, Loren E., Symposium Article, *Fair play fair pay: The need for a terrestrial Public Performance Right and General Copyright Reform*, 3 Belmont L. Rev. 71 (2016) ............................................................. 26

S. Rep. No. 104–128 (1995) ................................................. 15, 18, 20

United States Copyright office, *Copyright and the Music Marketplace*, February 2015 ............................................................................... 19

Vukovic, Adam, Note, *"Please don't stop the music": The need for fairness in digital copyright*, 65 Hastings L.J. 1419 (2014) .............................. 26

# I. JURISDICTIONAL STATEMENT

Jurisdiction in the district court is proper under 28 U.S.C. § 1338 as the Complaint presents an action pursuant to the U.S Copyright Act. App. 1. This appeal is authorized by 28 U.S.C. § 1291 that grants the Court of Appeals jurisdiction of appeals from decisions of district courts of the United States. The district court entered its Opinion on September 30, 2022. Addendum 1, App. 504. Final Judgment was entered on September 30, 2022. Addendum 9, App. 506. On October 25, 2022, defendant Carlos Juan Aponte-Cruz filed a timely notice of appeal. App. 507.

# II. STATEMENT OF ISSUE PRESENTED FOR REVIEW

This case presents a matter of first impression. At issue is whether featured recording artist royalties from digital transmissions of sound recordings under 17 U.S.C. § 114(g)(2)(D) belong to a band as a whole or to the band's owner.

# III. STATEMENT OF THE CASE

El Gran Combo is a musical group founded by appellee Rafael Ithier (Ithier) in 1962 and owned by him to this day. App. 41 (Def.'s Statement of Material Facts No. 1), admitted in App. 131 (Pl.'s Opp'n to Def.'s Mot. For Summ. J.). Appellee EGC, Corp. is an entity created by Rafael Ithier to administer the rights owned by him. App. 5 (Compl. ¶ 20).

El Gran Combo typically has 13 members and a director: three singers, two saxophone players, two trumpet players, a trombone player, a bass player, a pianist, a timbales player, a conga player, a bongo player, and the director. App. 41 (Def.'s Statement of Material Facts No. 3), admitted in App. 131 (Pl.'s Opp'n to Def.'s Mot. For Summ. J.).

As owner, Ithier selects the vocalists and musicians who are members of the band. App. 41 (Def.'s Statement of Material Facts No. 2), admitted in App. 131 (Pl.'s Opp'n to Def.'s Mot. For Summ. J.). For some sound recordings, Ithier also hires backup vocalists or chorus that are not members of the band. App. 42 (Def.'s Statement of Material Facts No. 4), admitted in App. 131 (Pl.'s Opp'n to Def.'s Mot. For Summ. J.).

Appellant Carlos Juan Aponte Cruz (Aponte) was a member of the band for 51 years (1973 to 2014). App. 42 (Def.'s Statement of Material Facts No. 6 mistakenly identified as 3), admitted in App. 131 (Pl.'s Opp'n to Def.'s Mot. For Summ. J.).

Aponte is the lead vocalist in over 200 sound recordings of the band. App. 42 (Def.'s Statement of Material Facts No. 7, mistakenly identified as 4), qualified in App. 131 (Pl.'s Opp'n to Def.'s Mot. For Summ. J.) saying "There are no lead singers in El Gran Combo. Only vocalists." But see App. 97 (Pl.'s Answer to

Interrogatory No. 3: "Carlos Aponte was the lead singer in the songs listed on Exhibit A.").

In 1995 Congress enacted the Digital Performance Right in Sound Recordings Act (DPRA), Pub. L. No. 104-39, § 2, 109 Stat. 336, amending the Copyright Act of 1976 to provide, *inter alia*, for the payment of royalties to what it called featured and nonfeatured artists in sound recordings transmitted digitally. Register of Copyrights Marybeth Peters saw the amendments as an act of justice to performers who until then had no right to royalties from their performances fixed in sound recordings. S. Rep. No. 104–128 at 13 (1995).

SoundExchange, an unincorporated division of the Recording Industry Association of America, Inc., is the Designated Agent by the Librarian of Congress to distribute the royalties to featured and nonfeatured artists. 37 C.F.R. § 261.4(c). As per the statute, it pays 50 percent of the royalties to the copyright owners of a sound recording, 45 percent to the recording artist or artists featured on the sound recording, and the remaining 5 percent to non-featured musicians and vocalists that participated in the sound recording.

In 2017, after leaving the band, Aponte made a formal request to SoundExchange for royalties from El Gran Combo sound recordings where he is the lead singer. App. 8 (Compl. ¶ 34), admitted in App. 26 (Answer to Compl. ¶ 34). Up until then, SoundExchange had been remitting all El Gran Combo sound recording

royalties to Ithier, who did not distribute them to band members. App. 8 (Compl. ¶ 38), admitted as to Aponte in App. 26 (Answer to Compl. ¶ 38). Ithier claims to have used the money for band related matters, such as uniforms, transportation, recording studio expenses, and the like, App. 102 (Ans. to Interrogatory No. 19.), expenses that were indirectly to the benefit of Aponte while a band member, but of no benefit to him once a former member.

Upon Aponte's request, SoundExchange froze all payments related to the sound recordings where he appears as lead singer for El Gran Combo until the matter got resolved. App. 8 (Compl. ¶ 37), admitted in App. 26 (Answer to Compl. ¶ 37). SoundExchange's Senior Corporate Paralegal Rebecca O'Donnell explained to EGC's vice-president Willie Sotelo, that: "[Y]ou said in your last email that Mr. Ithier is the owner and founder of El Gran Combo de Puerto Rico – however, that is actually irrelevant for the purposes of SoundExchange royalties. The only issue which this matter is concerned are who was the Featured Artist on each track. 'Featured Artist' means the group as a whole, which is El Gran Combo de Puerto Rico, as opposed to the lead singer, or the owner, founder or who owns the copyright." App. 413, App. 161 (Pl.'s Statement of Uncontested Facts Nos. 84-85), and App. 459 (Def.'s Response to Pl.'s Statement of Uncontested Facts No. 85).

On November 8, 2019, instead of pursuing SoundExchange's mediation mechanism (App. 413), Ithier and EGC chose to file a Declaratory Judgment Action

against appellant Aponte requesting that the district court declare that Ithier was the sole owner of El Gran Combo, that Aponte was an employee for hire of the band, and thus, that all royalties owed to the featured recording artist under the DPRA belonged to Ithier. App. 1. Ithier further requested that Aponte be declared a nonfeatured vocalists entitled only to royalties assigned to those artists under the DPRA. App. 11.

On April 7, 2021, Aponte filed an Answer to Complaint and Counterclaim, App. 21, asserting that featured recording artist royalties belong to the performers and that as lead singer for El Gran Combo, he was entitled to a share. App. 21.

On February 28, 2022, Aponte moved for partial summary judgment stating that the case was apt for summary disposition because it was strictly a matter of statutory interpretation. That the essential material facts were not in dispute, namely: Ithier is the owner of El Gran Combo, he hires and fires band members at will, and Aponte was a lead singer in over 200 El Gran Combo sound recordings. Aponte argued that 17 U.S.C. § 114(g)(2)(D)'s reference to "the recording artist or artists featured on such sound recording," when the artist is a band or group, is a reference to the members of the band, not to its owner, because the statute's aim is to compensate the artists performing on the sound recordings. App. 31.

On March 21, 2022, Ithier filed his Opposition to Defendant's Motion for Summary Judgment & Cross Motion for Summary Judgment. App. 129. Ithier

argued that Aponte is not the featured artist in those sound recordings because the album covers only mention El Gran Combo by name and not him. That because Aponte was not a featured artist entitled to royalties under subsection D, he instead was necessarily a nonfeatured vocalist entitled to royalties under subsection C. App. 139.

On April 1, 2022, Aponte filed his Opposition to Plaintiff's Cross Motion for Summary Judgment. App. 449. He argued that a nonfeatured artist under the statute is a reference to background vocalists; that SoundExchange use of "i.e." in the statement: "A 'non-featured artist' is an artist who is not prominently featured on a sound recording, track or album (i.e. a session musician or a back-up vocalist)", confirms that. That as lead singer he is clearly not a background vocalist and thus to interpret the term "featured artist" as a reference to a band owner and not the band members would lead to an absurd result where a background vocalist hired by the band's owner for a recording session is entitled to performance royalties but not the band's lead singer in that same sound recording.

On September 19, 2022, the magistrate issued a Report and Recommendation discarding Aponte's interpretation that nonfeatured vocalists is a reference to background vocalists. Addendum 1, App. 492-96. The court pointed out that the statute nowhere excludes lead singers in the nonfeatured vocalist group, and that it can only speculate as to why SoundExchange used "i.e" instead of "e.g." when it

refs to nonfeatured vocalists as background vocalists. App. 495. It reasoned that Aponte could not be a featured artist just because he was a member of the band, that he was a nonfeatured vocalist instead. The court then concluded that the featured artist entitled to subsection D royalties was El Gran Combo, consequently its owner. Addendum 9, App. 497.

On September 29, 2022, Aponte filed his Objection to Report and Recommendation, pointing out that the magistrate had misconstrued his argument. App 498. Aponte does not claim that he, as lead singer, is the featured artist and not El Gran Combo. Aponte's claim is that El Gran Combo qua its members, not its owner, is the featured artist, and that as a member he is entitled to a share of those recording artist royalties; that SoundExchange's email to EGC confirms that reading when it states that: "'Featured Artist' means the group as a whole, which is El Gran Combo de Puerto Rico, as opposed to the lead singer, or the owner, founder or who owns the copyright for a group." App. 500. Aponte added that the court could not dismiss SoundExchange's use of "i.e." in describing nonfeatured vocalists as back-up vocalists, by simply saying that it would be a matter of speculation to guess why it used "i.e." instead of "e.g.", and then assume, without any other reason, that SoundExchange meant "e.g." App. 501-02.

On September 30, 2022, the district court issued an Order adopting the Report and Recommendation. Addendum 10, App. 504. To further downplay how

SoundExchange interprets the statute it administers, the court declined to afford it even the minimal deference given to agencies and denied any probative value to the SoundExchange email to EGC, stating that it was "not an official interpretation of SoundExchange, but merely the opinion of an employee." App. 504.

Judgment was entered on September 30, 2022. Addendum 12, App. 506. On October 25, 2022, defendant Aponte filed a timely notice of appeal from the district court's judgment. App. 507.

## IV. SUMMARY OF THE ARGUMENT

A band's recording artist royalties under 17 U.S.C. § 114(g)(2)(D), belong to the band as a whole, not to the band's owner. That is so because, as appellant Aponte – a lead singer in the El Gran Combo de Puerto Rico band for fifty years and in more than 200 sound recordings – argued, the statute seeks to compensate the performers who created the sounds, not a band as an abstract concept.

The statute at issue resulted from Congress amending the Copyright Act of 1976 with the Digital Performance Right in Sound Recordings Act of 1995 to provide copyright protection for sound recordings transmitted digitally, such as over the internet or via satellite. In what was regarded as an act of justice, the act provided that 45 percent of the royalties for digital transmissions would be paid to the featured artists performing on the sound recordings, with another 5 percent going to compensate session musicians and back-up vocalists.

The district court erred in concluding that when a band is the featured artist, the 45 percent royalties are payable to the band's owner and not shared among the band members, whom the court erroneously equated to back-up vocalists and supporting musicians.

The statutory language, the legislative record, and the manner in which those tasked with administering the statute have interpreted it, make it abundantly clear that when a featured artist is a band, those royalties do not belong to the band's owner, but to the band as a whole, whose members create the recorded sounds.

## V. THE ARGUMENT

### A.    Standard of review

The standard of review for summary judgment is *de novo. Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 37 F.4th 746, 750-51 (1st Cir. 2022). Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply require the Court of Appeals to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Id*. at *759-60; Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E.,* 615 F.3d 45, 51 (1st Cir. 2010) (quoting *Adria Int'l Grp., Inc. v. Ferré Dev., Inc*., 241 F.3d 103, 107 (1st Cir. 2001)).

Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(a). The parties in this case agree that the case may be adjudicated through summary judgment.

**B.** **The statutory language and royalty structure of 114(g)(2), as well as the legislative record and the interpretation by the entities that administer the statute, demonstrate that the artist royalties of a band do not belong to the band's owner, but to the band as a whole, whose members create the recorded sounds.**

In granting summary judgment in favor of Ithier, the district court concluded "that the band El Gran Combo (and, consequently, its owner) is the artist featured in the El Gran Combo sound recordings entitled to 45 percent of the proceeds of royalties as set forth in 17 U.S.C. § 114(g)(2)(D)." Addendum 9, App. 497. The court denied Aponte's claim for a share in those royalties as the lead singer in over 200 El Gran Combo sound recordings, finding that he is instead a "nonfeatured vocalist" in those sound recordings entitled to a share of the 2.5 percent royalties provided to those performers under § 114(g)(2)(C). Addendum 7, App. 495. That is an error. The statutory language, the legislative history, and the interpretation of those tasked with administering the statute, support the conclusion that the featured recording artist in subsection D is not El Gran Combo qua its owner, but the band El Gran Combo as a whole. Its members, including Aponte, are the performers that created the recorded sounds that the statute aims to compensate and are entitled to their share in the 45 percent royalties reserved for the featured artist and not the 2.5 percent reserved for background musicians and 2.5 percent for background vocalists.

In interpreting the meaning of a statute, the Court of Appeals must begin its analysis with the statutory text and determine whether the same is plain and unambiguous. *Recovery Group, Inc. v. C.I.R*, 652 F.3d 122, 125 (1st Cir. 2011). In so doing, the Court of Appeals shall accord the statutory text its ordinary meaning by reference to the specific context in which that language is used, and the broader context of the statute as a whole. *Id*. If the statutory language is plain and unambiguous, the Court must apply the statute according to its terms, except in unusual cases where, for example, doing so would bring about absurd results. *Id*. If the statute is ambiguous, because it admits of more than one reasonable interpretation, the Court looks beyond the text to the legislative history to determine congressional intent. *Id*.; *United States v. Vidal-Reyes*, 562 F.3d 43, 50-51 (1st Cir. 2009).

When an agency that administers a statute has provided an interpretation, the courts afford it varying degrees of deference depending on the circumstances. Even where an agency's interpretations may not be controlling, the Supreme Court has recognized that they nonetheless "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift Co*., 323 U.S. 134, 140 (1944). That is so because the agency acts "pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case." *Id*. at 139. In those cases, the weight that courts afford an agency's interpretation "depend[s] upon

the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.* at 140.

The statute at issue in this appeal is 17 U.S.C. § 114(g), in particular the meaning of the phrases "the recording artist or artists featured on such sound recording" in § 114(g)(2)(D), of "nonfeatured recording artist" in § 114(g)(1)(B), and "nonfeatured musician" and "nonfeatured vocalist" in §§ 114(g)(2)(B) and (C).

The statute is part of the Digital Performance Right in Sound Recordings Act of 1995 (DPRA), Pub. L. No. 104-39, § 2, 109 Stat. 336, that amended the Copyright Act of 1976 to provide copyright protection for sound recordings transmitted digitally, such as over the internet or via satellite. The DPRA amended the Copyright Act to establish an exclusive right to perform a copyrighted work publicly by means of a digital audio transmission (17 U.S.C. § 106(6)) and provide a statutory framework for the payment of royalties from those digital transmissions to the intended beneficiaries (17 U.S.C. 114g). *See SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 46 (D.C. Cir. 2018).

Section 114(g) in its entirety reads as follows:

(g) Proceeds from Licensing of Transmissions.—

(1) Except in the case of a transmission licensed under a statutory license in accordance with subsection (f) of this section—

12

(A) a featured recording artist who performs on a sound recording that has been licensed for a transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the artist's contract; and

(B) a nonfeatured recording artist who performs on a sound recording that has been licensed for a transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the nonfeatured recording artist's applicable contract or other applicable agreement.

(2) Except as provided for in paragraph (6), a nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions in accordance with subsection (f) shall distribute such receipts as follows:

(A) 50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.

(B) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians [AFM] (or any successor entity) to be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.

(C) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists [AFTRA] (or any successor entity) to be distributed to nonfeatured vocalists (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

(D) 45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings).

17 U.S.C. 114(g)(2).

**Subsection (1)(A)(B)** need not concern us here, except insofar as it describes featured and nonfeatured recording artists as someone who "performs on a sound recording." Under the Copyright Act "[t]o 'perform' a work "means to recite, render, play, dance, or act it, either directly or by means of any device or process." 17 U.S.C § 101. A recording artist, hence, must do one of those things.

**Subsection (2)** provides that a nonprofit collective will be designated by the Copyright Royalty Judges to distribute receipts from digital transmissions. SoundExchange is such Designated Agent. 37 C.F.R. § 261.4(c); *see SoundExchange, Inc. v. Muzak LLC*, 854 F.3d 713, 715 (D.C. Cir. 2017). As per subsection 2, it pays royalties under A and D directly to the sound recordings' copyright owners and to the artists featured on the sound recordings. Subsections B and C instruct SoundExchange to deposit royalties to nonfeatured musicians and vocalists in escrow accounts administered by AFM and AFTRA. They, in turn, have created a joint escrow account called the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund who identifies and handles the distribution to those nonfeatured artists. https://www.afmsagaftrafund.org/AboutUs/MissionAndVision, January 2, 2023.

**Subsection (2)(A)** provides for 50 percent royalties to copyright owners. These are not at issue in this appeal. Appellant Ithier readily admits that he owns or co-owns the sound recording copyrights. App. 146. He argues that being entitled to

royalties under subsection A as copyright owner does not exclude him from collecting royalties under subsection D as band owner. App. 146. That is irrelevant here. Aponte's argument that for purposes of subsection D royalties El Gran Combo means the band as a whole and not its owner Ithier, is predicated solely on the language and purpose of subsection D and is in no manner dependent on what subsection A may provide for.

**Subsection (2)(B) and (C)**, grant 2.5 percent royalties to nonfeatured musicians and 2.5 percent to nonfeatured vocalists. While the statute does not provide a definition for "nonfeatured" vocalist or musician, the Senate Report makes it clear that it is a reference to background artists. The report's section by section analysis so states in the following parenthetical phrase from its analysis of section 114(g): "…featured and nonfeatured (or background) artists… ." S. Rep. 104-128 at 31 (1995). An "or" conjunction may be used to introduce an alternative (coffee or tea) or to present an equivalent (lessen or abate). Its use here is clearly the latter. If "background artists" were something different to "nonfeatured artists" and both were alternatives entitled to royalties, the phrase "background artist" would have to appear in the statute in addition to "nonfeatured artists," but it does not. Furthermore, the Senate Report sets "(or background artists)" in parenthesis, which indicates that what is being offered is an explanatory word or phrase. Thus, by writing

"nonfeatured (or background) artists," the Senate Report is equating nonfeatured artists with background artists.

SoundExchange, the entity that administers the funds, provides an equivalent definition on its web-page: "A 'non-featured artist' is an artist who is not prominently featured on a sound recording, track or album (i.e. a session musician or a back-up vocalist)." https://www.soundexchange.com/frequently-asked-questions/, January 2, 2023. Like the Senate Report, it sets the expression in parenthesis indicating that it is an explanation. It further reinforces that with "i.e." an abbreviation for *id est* that means "that is" and works as a restatement or elaboration of what was said before.

Session musicians and back-up vocalists are background artists. According to Berkley College of Music: "Session musicians are expert studio players who are hired on a short-term basis to record backing tracks for recording artists." https://www.berklee.edu/careers/roles/session-instrumentalist, January 2, 2023. In turn, "[a] backup singer is a professional vocalist who is hired to perform supporting vocal parts on studio recordings and at live performances." https://www.berklee.edu/careers/roles/session-singer, January 2, 2023. To say that one records "backing tracks" and the other "supporting vocal parts" is, evidently, categorizing them as background artists hired for a particular recording session.

**Subsection (2)(D)** is the heart of the dispute in this appeal. It provides that "45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording." 17 U.S.C. § 114(g)(2)(D).

"Featured artist" is not defined in the statute. One of Merriam-Webster's definitions for "featured" is "special attraction," which is consistent with SoundExchange's web site description of "featured artist" as "the group or individual most prominently featured on a sound recording, track or album." https://www.soundexchange.com/frequently-asked-questions/, January 2, 2023.

Who, then, is the featured recording artist in this case? A substantial bit of the district court's error comes from misconstruing that question. It assumes that Aponte is arguing that he is the featured artist and not El Gran Combo. And so it becomes significant for the court that album covers mention El Gran Combo by name but not Aponte, App. 491, and that SoundExchange defines a featured artist as "the group, band or individual name as it appears on the release of the recording," App. 493, which, again, is El Gran Combo. Ithier had pointed out that the element most widely used to identify the featured artist for payment is the information encoded in the sound recordings, App. 137, and that the International Standard Recording Code (ISRC) search engine appearing in the SoundExchange welcome page shows El Gran Combo as the artist in every album there included. App. 159 and 344-49. The

featured artist, the court concluded, is therefore El Gran Combo and not Aponte. But Aponte has never claimed that he as opposed to El Gran Combo, is the featured artist. His claim is that "featured artist" in this context, means the band as a whole whose members performed on the sound recording.

The legislative intent supports Aponte's reading. The statute's purpose, according to the Senate Report, "is to ensure that performing artists, record companies and others whose livelihood depends upon effective copyright protection for sound recordings, will be protected as new technologies affect the ways in which their creative works are used." S. Rep. No. 104–128 at 10 (1995).

That dual interest in providing royalty payments to the performing artists on the one hand and the producers on the other was reiterated throughout the legislative hearings. Bruce A. Lehman, the Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, testified that: "[W]e believe that the time has come to bring protection for performers and producers of sound recordings into line with the protection afforded to the creators of other works." S. Rep. No. 104–128 at 13 (1995). Similarly, Register of Copyrights Marybeth Peters testified that: "[J]ustice requires that performers and producers of sound recordings be accorded a public performance right." *Id*.

In presenting the bill to the Senate Floor, senator Orin Hatch highlighted the pursued interest that all participants in a sound recording be compensated: "Mr.

President, it is important that the creators of America's music–whether they compose the score, write the lyrics, sing the songs, or produce the recordings–be fairly and equitably compensated for the public performances that result. For too long they have not been." 141 Cong. Rec. S11949 (1995) (statement of Sen. Hatch).

All of that strongly suggests that the statute seeks to compensate the human beings that created the sounds that got recorded. As the Copyright Office has observed: "The creators of sound recordings typically include recording artists— that is, the singer or members of the band who are featured in the recording." United States Copyright office, *Copyright and the Music Marketplace*, February 2015, 21 https://www.copyright.gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf.

Compensating the band's owner instead of the band members, would leave that central element of the legislative purpose unachieved. While the district court recognized that under the statute a featured artist "performs on a sound recording," it failed to grasp the imprint of that. If to "perform on a sound recording" is the act of creation the statute seeks to compensate, the creators must be compensated, and those are the band members.

SoundExchange's Senior Corporate Paralegal Rebecca O'Donnell's was being consistent with that interpretation, in explaining to EGC why they froze all royalty payments upon Aponte's demand for a share of the royalties: "[Y]ou said in

your last email that Mr. Ithier is the owner and founder of El Gran Combo de Puerto Rico – however, that is actually irrelevant for the purposes of SoundExchange royalties. The only issue which this matter is concerned are who was the Featured Artist on each track. 'Featured Artist' means the group as a whole, which is El Gran Combo de Puerto Rico, as opposed to the lead singer, or the owner, founder or who owns the copyright." App. 413.

The statutory framework as well as the common meaning of the terms as used in the statute, make clear that "the recording artist or artists featured on such sound recording" is a reference to the human beings performing and producing the sounds that are heard in the sound recording, not the owner of the band. El Gran Combo may be the featured artist, but not as an abstraction to be differentiated from its member musicians and vocalists. El Gran Combo is the featured artist because it is made up of those musicians and vocalists.

**C.    The district court's conclusion that royalties under 114(g)(2)(D) belong to the band's owner and not the band as a whole leads to an absurd result.**

The district court found it significant that: "[w]hile the statute is specific as to musicians and vocalists being entitled to royalties per Sections 114(g)(2)(B) and (C), it uses the more expansive term of 'artist' to refer to those that are entitled to royalties under Section 114(g)(2)(D)." App. 494. Thus, it reasoned, if El Gran Combo is regarded as the artist, then its vocalists and musicians are not the artist under §

20

114(g)(2)(D). For the court, then, where the statute uses the terms "vocalists" and "musicians" in B and C it is referring to the actual human beings performing in the sound recordings, but by choosing a different term, "artists," in D, it is not referring to the human beings that are members of a band. That leads to an absurd result.

It is a venerable principle that a law will not be interpreted to produce absurd results. *KMart Corp. v. Cartier, Inc*., 486 U.S. 281, 325 (1988) (Scalia, J., concurring in part and dissenting in part) (quoting *United States v. Kirby*, 74 U.S. 482, 487 (1868)). Stated differently: "It has been called a golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." *Kelly v. U.S.*, 924 F.2d 355, 361 (1st Cir. 1991) (quoting 2A Sands, *Sutherland Stat. Const.* § 45.12 at 54 (4th ed. 1984-85)).

As the court recognizes, nonfeatured musicians and vocalists are actual human beings performing on the sound recording. We know from the discussion earlier that these are background artists that are hired ad hoc for a particular recording session. If a featured recording artist under § 114(g)(2)(D) is read to mean the band owner and not the band members because the terms "vocalist" and "musicians" are not used there, then a statute that seeks to compensate performers would provide compensation for extras brought in for an afternoon session to stand

at the back of the studio and utter supportive lyrics, but no compensation to a lead singer with fifty years with the band. That is an absurd result.

There is no mystery in the use "artists" in subsection D but "musicians" and "vocalists" in subsections B and C. As was seen above, the Senate Report and SoundExchange use "nonfeatured artist" as a reference to musicians and vocalists collectively. Ithier himself uses the term "non featured artist" in the complaint and in his opposition and cross for summary judgment as a reference to both. App. 5, ¶16, 140, 141, and 144. And the statute itself, just a few lines before in § 114(g)(1)(B), uses the term "nonfeatured artist." It is evident that for § 114(g)(2)(B) and (C) Congress segregated "nonfeatured artists" into "nonfeatured musicians" and "nonfeatured vocalists" because it was assigning royalty distribution tasks to separate labor unions that represent vocalists and musicians (AFM and SAG-AFTRA). The court is therefore wrong in reading "artist" as something conceptually distinct from "musicians" and "vocalists," as if it allows for an abstract El Gran Combo as the performer, independent of its members. "Artists" is just a general term that includes vocalists and musicians, not a different category of performer. Thus, shutting band members including Aponte out of featured recording artist royalties on account of that distinction is erroneous.

Providing for 2.5 percent of royalties to nonfeatured musicians and 2.5 percent to nonfeatured vocalists, shows how far Congress went to make sure that all

individual performers involved in the creation of the sound recording got royalties, regardless of how they were hired. To conclude that Congress meant to compensate those back-up performers because it used specific language such as "vocalists" and "musicians," but not band members and lead singers because it uses the "more expansive term artist," is an unreasonable interpretation of the statute.

**D.** **Aponte as lead singer is not a nonfeatured vocalist under 114(g)(2)(C) because that term refers to back-up vocalists hired ad hoc for sound recordings, not to regular band members.**

As a workaround to the absurd result of back-up singers collecting royalties but not Aponte as lead singer, the district court concluded that Aponte was entitled to royalties as a "nonfeatured vocalist" under § 114(g)(2)(C). As the court would have it, Aponte is to share with all vocalists, including back-up vocalists, the 2.5 percent of the royalties reserved to nonfeatured vocalists, an amount that is considerably less than the 45 percent reserved to the featured artist in which he is the lead singer. That conclusion goes against the definition of "nonfeatured artist," found in the Senate Report and adopted by SoundExchange, as discussed earlier, describing them as background or back-up artists.

Aponte, as a lead singer and member of El Gran Combo for fifty years, is clearly not that. A lead singer is the opposite of a backup vocalist. A lead singer is typically the primary vocalist in a band, while a backup vocalist provides supporting

vocals and harmonization to the lead singer. Ithier's expert Angel Cucco Peña admits as much:

> Q. If I use the term "backup vocalist," would that be what you call "the chorus"?
>
> A. Yes. That's correct.
>
> ...
>
> Q. .... But when one talks about a backup vocalist, one is not referring to the lead singer, right?
>
> A. No, you're not. Doc. 24-20, p. 21.

App. 388.

While the court quoted extensively from the Senate Report, it did not address the report's reference to "nonfeatured artists" as "background artists." The court focused, instead, on dismissing Aponte's reading of SoundExchange's reference to nonfeatured artists as "i.e. session musicians and back-up vocalists." Ithier had posited that SoundExchange's parenthetical expression was "by means of example." App. 143. That ignores what "i.e" means. If SoundExchange had intended to use session musicians and back-up vocalists by way of example it would have had to use "e.g.," which stands for *exempli gratia* in Latin and means "for example."

The district court, similarly, believes that the i.e./e.g. distinction is spurious. It said that: "The Court can only speculate as to why the SoundExchange website includes the letters 'i.e.,' rather than 'e.g.,' when it refers to some of the categories

of artists (namely, session musicians or backup vocalists) that could be 'nonfeatured artists.'" Addendum 7, App. 495. The court then assumed, admitting that it was doing so through speculation, that SoundExchange used "i.e" as if equivalent to "e.g." But that does not hold up.

That SoundExchange meant what it said is reinforced by the fact that the entity it pays nonfeatured artist royalties to, the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund, also sees it that way. Appearing before the U.S. District Court for the California Central District, the fund described itself as: "a trust established to collect, allocate, and distribute royalties to session musicians and background vocalists (together, 'non-featured performers') who contributed to sound recordings played by certain digital music services." Defs.' Notice of Mot. and Mot. for Summ. J. or, in the Alternative, for Partial Summ. J.; Mem. of P. & A. 7, ECF No. 103, *Risto v. Screen Actors Guild-American Federation of Television and Radio Artists, et al.* (18-07241 (USDC Cal Central District)).

That is also the way in which law review publications consistently refer to nonfeatured artists. *See* Rick Marshall, *The Quest for "Parity": an examination of the radio fairness act*, 60 J. Copyright Soc'y U.S.A. 445, 466 (2013) (Of the royalties it collects for a given sound recording, SoundExchange pays 50% to the sound recording owner (in most cases a record label), 45% to the artist featured on the sound recording, and 5% to any non-featured performing artists (background

singers, musicians, etc.)); Amanda Alasauskasa, Comment, *Save Rock and Roll: A look at rights afforded to pre-1972 sound recordings and why federalization should be granted*, 66 DePaul L. Rev. 265, 274 (2016) (The royalties collected from the license for these broadcasts are to be split 50/45 between the owner of the sound recording and the featured artists, respectively. The remaining five percent is distributed to nonfeatured artists, such as back-up vocalists.); Sam Kronenberg, Note, *Royalty Rates and Exclusive Releases Threaten Music Streaming*, 27 S. Cal. Interdisc. L.J. 633, 638 (2018) (45% are paid directly to the 'featured artist' on the recording, 5% goes to a fund for non-featured artists, which typically consists of session musicians and background singers.); Adam Vukovic, Note, *"Please don't stop the music": The need for fairness in digital copyright*, 65 Hastings L.J. 1419, 1431 (2014) (Under section 114, sound recording royalties are distributed as follows: fifty percent to the holder of the copyright (usually the record label), forty-five percent to the featured artists, and the remaining five percent for any non-featured artists (back up vocalists and musicians)); Loren E. Mulraine, Symposium Article, *Fair play fair pay: The need for a terrestrial Public Performance Right and General Copyright Reform*, 3 Belmont L. Rev. 71, 99 (2016) (Under the law, 45% of performance royalties are paid directly to the featured artists on a recording, and 5% are paid to a fund for non-featured artists, typically session musicians and background singers; Justin Hughes, Robert P. Mergesa, *Copyright and Distributive*

*Justice,* 92 Notre Dame L. Rev. 513, 534 (2016) (On the performing artist side of the ledger, SoundExchange sends 45% of distributions to the "featured artists" and 5% to "non-featured artists, typically session musicians and background singers.").

Perhaps implicitly accepting that Aponte might be correct in how he reads SoundExchange's use of "i.e." as limiting nonfeatured artists to background artists, the district court observed that SoundExchange's interpretations are not entitled to the deference given to administrative agencies because it is just a distributor of receipts from digital transmission with no rulemaking power. App. 504-05, *cf. South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97 (1st Cir. 2002). That too is an error.

In tasking SoundExchange with distributing the receipts from digital transmission, Congress entrusted it with administering the statute. Thus, SoundExchange's interpretation, even if not controlling, deserves at a minimum deference as a source for guidance. *Skidmore,* 323 U.S. at 140. The district court could not simply disregard SoundExchange's interpretation without examining "the thoroughness evident in [its] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.* at 140. That analysis could have led the court to the Senate Report's earlier and AFM SAG-AFTRA's later similar interpretations. The court had at a minimum, to acknowledge that SoundExchange's description was "based upon more specialized experience" and "broader investigations and information," as

the entity that deals daily with all featured artists, than what the court was coming across in this particular case. *Id*. at 139.

The court's conclusion, thus, that Aponte is a nonfeatured artist is patently wrong. As lead singer, Aponte is certainly a performer in the sound recordings and as such, an element of what makes El Gran Combo the featured artist. So are the other band members. Each, in varying degrees, is a piece of the featured artist because each is an integral part of the performance, creating the sounds that got recorded and are being digitally transmitted.

## VI. CONCLUSION

The district court erred in holding that royalties under 17 U.S.C. § 114(g)(2)(D) reserved for the artist featured on a sound recording belong the El Gran Combo's owner, and not to the band as a whole, whose members performed and created the recorded sounds. Congress passed the Digital Performance Right in Sound Recordings Act of 1995, where that statute is found, with the intent of amending the Copyright Act of 1976 to, *inter alia*, compensate performers as creators of America's music. That purpose is not achieved if a band such as El Gran Combo is regarded as an abstract entity independent from its members for purposes of royalties. The statutory language, legislative intent and the interpretation of administering entities such as SoundExchange, compel the conclusion that appellant

Aponte and the other members of El Gran Combo de Puerto Rico are entitled to those royalties.

WHEREFORE Carlos Aponte requests that the Court of Appeals reverse the district court's Judgment and enter summary judgment ruling that "the recording artist or artists featured on such sound recording" in 17 USC §114(g)(2)(D) means the band El Gran Combo as a whole, including the members that performed on each sound recording and that those royalties are to be divided among them in the manner SoundExchange determines appropriate.

RESPECTFULLY SUBMITTED

January 6, 2023.

<div style="margin-left:40%">

s/ José A. Hernández Mayoral
José A. Hernández Mayoral
*Counsel for Appellant*
1st Cir. Bar Number 9131
USDC-PR No. 205307
250 Tetuán St. Second Floor
San Juan, Puerto Rico 00901
Telephone:787-607-4867
Facsimile: 787-722-7782
jahm@mac.com
jose@hernandezmayoral.com

</div>

CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because: this brief contains 7,707 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac v.16.68 in 14 point Times New Roman.

3. The undersigned understands that a material misrepresentation in the certificate may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

s/ José A. Hernández Mayoral
*Counsel for Appellant*

Dated: January 3, 2022.

**ADDENDUM**

Report and Recommendation .................................................................................... 1

Order Adopting Report and Recommendation ..................................................... 10

Judgment ............................................................................................................. 12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| RAFAEL ITHIER and EGC, CORP. A/K/A EL GRAN COMBO<br><br>Plaintiffs/Counter Defendants<br><br>v.<br><br>CARLOS JUAN APONTE CRUZ A/K/A CHARLIE APONTE, et al.<br><br>Defendants/Counter Plaintiffs | Civil No. 19-2053 (JAG) |

**REPORT AND RECOMMENDATION**

This is an action for declaratory judgment. Defendant Charlie Aponte ("Aponte"), the lead singer of over 200 songs recorded by El Gran Combo, requested the payment of digital performance royalties collected and distributed by an entity called SoundExchange, Inc. ("SoundExchange") for the benefit of recording featured artists. Plaintiffs Rafael Ithier and EGC, Corp. a/k/a El Gran Combo (jointly, "Ithier") seek a declaration from the Court that Ithier—as sole owner of El Gran Combo—has the exclusive right to collect digital performance royalties intended for recording featured artists. Docket No. 1. Aponte filed a counterclaim seeking a declaration that, as a performer in El Gran Combo sound recordings, he is entitled to participate in the digital performance royalties collected and distributed by SoundExchange for the benefit of recording featured artists. Docket No. 10. The parties agree that there are no material issues of fact preventing the entry of summary judgment. Both sides have moved for summary judgment at Docket Nos. 20 and 23. The Court referred the matter to the undersigned for a Report and Recommendation. Docket No. 36. After considering the parties' submissions and the applicable law, the undersigned recommends that the Court **GRANT** Ithier's motion for summary judgment at Docket No. 23 and **DENY** Aponte's motion for summary judgment at Docket No. 20.

Rafael Ithier, et al. v. Carlos Juan Aponte, et al.
Civil No. 19-2053 (JAG)

## I.   Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is warranted when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is considered genuine if "a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party." Velázquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 270 (1st Cir. 2014)(citation omitted). A fact is "material" if it potentially affects the outcome of the suit. American Steel Erectors, Inc. v. Local Union No. 7, 536 F.3d 68, 75 (1st Cir. 2008). However, "[c]onclusory allegations, improbable inferences, and unsupported speculation are insufficient to establish a genuine dispute of fact." Velázquez-Pérez, 753 F.3d at 270 (citations omitted). A party moving for summary judgment bears the burden of proving that there are no genuine issues of material fact and that judgment as a matter of law is warranted. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). The moving party "may affirmatively produce evidence that negates an essential element of the non-moving party's claim" or "point to evidentiary materials already on file […] that demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir.2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317)).

## II.   Uncontested Facts

Having reviewed the submissions by both sides, the Court finds that the following material facts are not in dispute:

1.   Rafael Ithier created the orchestra known as El Gran Combo. Defendants' Statement of Material Facts at Docket No. 20 ("DSMF") at ¶ 1.

2.   As the owner of El Gran Combo, Rafael Ithier selects the singers and musicians who are members of the band. DSMF at ¶ 2.

3.   El Gran Combo is a band that typically has three singers, two saxophone players, two trumpet players, a trombone player, a bass player, a pianist, a timbales player, a conga player, a bong player, and a director. DSMF at ¶ 3.

4.   For a particular recording, Rafael Ithier might bring in backup singers or chorus that are not members of the band. DSMF at ¶ 4.

5.   Charlie Aponte was a singer in El Gran Combo between 1973 and 2014. DSMF at ¶ 6; Docket No. 20-4 at ¶ 15.

6.  Charlie Aponte was the lead singer in about 200 songs for El Gran Combo. DSMF at ¶ 7; Docket No. 20-4 at ¶ 3.

7.  Charlie Aponte has not been paid featured artist royalties by SoundExchange for El Gran Combo sound recordings in which he was lead singer or participant. DSMF at ¶ 8.

8.  SoundExchange website provides that: "The term 'featured artist' refers to the group or individual most prominently featured on a sound recording, track or album.". Plaintiff's Statement of Uncontested Facts at Docket No. 24 ("PSUF") at ¶ 8.

9.  None of the albums released by El Gran Combo while Charlie Aponte was in the band identified any of its members by name in the cover. PSUF at ¶ 20; Docket No. 24-1 at ¶ 4; Docket No. 24-3 at ¶ 5; Docket No. 24-4 at ¶ 5; Docket No. 24-7 at p. 18 ¶¶ 7-17.

10. The front covers of the albums only identified El Gran Combo. Charlie Aponte's name never appeared written as a featured artist in any of El Gran Combo album covers. PSUF at ¶¶ 26-27, 50-51; Docket No. 20-4 at ¶ 9; Docket No. 24-1 at ¶ 4; Docket No. 24-3 at ¶ 5; Docket No. 24-4 at ¶ 5; Docket No. 24-7 at p. 18 ¶¶ 7-17.

11. El Gran Combo and Charlie Aponte are two different artists. PSUF at ¶ 60; Docket No. 24-7 at p. 27 ¶¶ 4-9.

12. The principal artist audiences pay to see is El Gran Combo. PSUF at ¶ 61; Docket No. 20-4 at ¶ 9; Docket No. 24-7 at p. 18 ¶¶ 7-17; p. 27 ¶¶ 14-18.

13. According to the SoundExchange website "An artist is the group, band, or individual name as it appears on the release of the recording". PSUF at ¶ 75.

### III.  Discussion

At issue in this case is who is a "recording artist featured" in the El Gran Combo sound recordings entitled to the royalties collected from digital performances and to be distributed pursuant to 17 U.S.C. § 114(g)(2)(D). Ithier argues that the only featured artist is El Gran Combo and that as the owner of the band he is solely entitled to 45% of the royalties. Aponte argues that the members of the band El Gran Combo are all featured artists under the statute and are entitled to a share of 45% of the royalties. The statute does not define the term "featured artist" and the Court has not found case law on point. Both sides make a good case for their respective positions, but the legislative history of the statute undoubtedly favors Ithier's interpretation.

The Digital Performance Right in Sound Recordings Act was passed by Congress in 1995 to amend the U.S. Copyright Act in 17 U.S.C. §§ 101 et seq. Pub. L. No. 104-39, 109 Stat. 336 (1995). It was signed into law on November 1, 1995, to provide copyright protection to sound

recordings by including a new right for public performances of sound recordings by digital audio transmission. 17 U.S.C. § 106(6). Certain digital music services are now required to pay recording companies and recording artists when they transmit the sound recordings. Recording Industry Association of America v. Librarian of Congress, 176 F.3d 528, 530 (D.C.Cir. 1999). The law created a statutory license for those wishing to transmit the copyrighted work. SoundExchange, Inc. v. Muzak, LLC, 322 F.Supp.3d 72, 74 (D.D.C. 2018). This allows digital audio services to perform copyrighted sound recordings by paying predetermined royalties without having to seek separate permissions from copyright holders. SoundExchange, Inc. v. Copyright Royalty Board, 904 F.3d 41, 46 (D.C.Cir. 2018). The compulsory licensing regime is set out in Section 114 of the Copyright Act. SoundExchange is designated by regulation as the sole entity to collect royalties for digital performances under the statutory licenses. SoundExchange, Inc. v. Muzak, LLC, 322 F.Supp.3d 72, 75 (D.C. 2018). SoundExchange then distributes the proceeds among artists, musicians, vocalists, and copyright holders as set forth in Section 114(g)(2). Id.

Section 114(g)(2) establishes how the proceeds from the licensing of digital audio transmissions are to be distributed:

> **(g) Proceeds from licensing of transmissions.—**[…]
> **(2)** Except as provided for in paragraph (6), a nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions in accordance with subsection (f) shall distribute such receipts as follows:
> **(A)** 50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.
> **(B)** 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) **to be distributed to nonfeatured musicians** (whether or not members of the American Federation of Musicians) who have performed on sound recordings.
> **(C)** 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) **to be distributed to nonfeatured vocalists** (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

> **(D)** 45 percent of the receipts shall be paid, **on a per sound recording basis, to the recording artist or artists featured on such sound recording** (or the persons conveying rights in the artists' performance in the sound recordings). 17 U.S.C. § 114(g)(2) (emphasis added).

Per Section 114(g)(2), 5% of the proceeds are to be distributed to nonfeatured musicians and nonfeatured vocalists, and 45% of the proceeds are to be distributed to recording artist(s) featured on each sound recording. The question here is who is a "recording artist featured" under Section 114(g)(2)(D) to be entitled to 45% of the proceeds from royalties collected by SoundExchange.

Aponte's arguments in favor of the position that he (as well as all other members of El Gran Combo) is a "featured artist" under the statute (entitled to a portion of 45% of the proceeds from royalties) can be summarized as follows. There is no clear definition of the term "featured artist" in the statute, but Section 114(g)(1)(A) does refer to a featured recording artist as one who "performs on a sound recording". According to Section 101 of the Copyright Act to "perform" a work is to "recite, play, dance, or act it, either directly or by means of any device or process." 17 U.S.C. § 101. Thus, as argued by Aponte, to be a "featured recording artist" one must be a human being able to perform on a sound recording. And a band such as El Gran Combo is incapable of "performing" as defined by statute. Aponte further sustains that because Sections 114(g)(2)(B) and (C) refer to nonfeatured musicians and nonfeatured vocalists—leaving out featured vocalists— lead singers would have to be considered "featured artists" under Section 114(g)(2)(D). Otherwise, the statute would grant more rights to a nonfeatured vocalist or backup singer than to a lead singer. Aponte also argues that, to the extent that SoundExchange defines a "nonfeatured artist" as "an artist who is not prominently featured on a sound recording, track, or album (i.e., a session musician or a back-up vocalist)", a lead singer cannot be a nonfeatured artist and must be a featured one.

Ithier insists that Aponte is a nonfeatured vocalist entitled to a portion of 2½% of the royalty proceeds under Section 114(g)(2)(C). Ithier's logic: "featured" means displayed, advertised or presented as a special attraction, and SoundExchange defines an "artist" as "the group, band, or individual name as it appears on the release of the recording". Ithier posits that, because El Gran Combo has always been the main attraction, it is the only possible "featured artist" under the statute and its owner is solely entitled to 45% of the proceeds of the royalties under Section 114(g)(2)(D). As to Aponte's argument that because he is a lead singer, he cannot fall

<div align="center">5</div>

under the meaning of a nonfeatured vocalist, Ithier counters that, to the extent that the statute does not explicitly exclude a lead singer as a nonfeatured vocalist, the statute must be interpreted to allow the inclusion of a lead singer in Section 114(g)(2)(C) if that lead singer is not featured. That is, a singer may fall under Section 114(g)(2)(C) regardless of whether he is a lead singer or a back up singer; what matters is whether he is "featured" or prominently displayed on a sound recording, track, or album.

The material facts are not on dispute. Ithier is the owner of El Gran Combo. Aponte was a lead singer of approximately 200 sound recordings of the band. El Gran Combo and Aponte are two different artists, none of the albums released by the band identified any of its members by name in the cover (these only identified El Gran Combo), and the audiences paid to see El Gran Combo. Per the above, it is more than reasonable to conclude that El Gran Combo and not Aponte (or other members of the band) was the artist prominently displayed in the El Gran Combo sound recordings. The question then is whether by featuring El Gran Combo as a band, the members of the band were consequently "featured" for purposes of the distribution of royalties under Section 114 of the U.S. Copyright Act.

The Digital Performance Right in Sound Recordings Act of 1995 did not define the term "featured artist"; other than to state that the "featured artist" "performs on a sound recording". 17 U.S.C. § 114(g)(1)(A). The statute does distinguish between nonfeatured musicians and nonfeatured vocalists (Sections 114(g)(2)(B) and (C)) and featured artists (Section 114(g)(2)(D)) for purposes of the distribution of royalties under the statutory licensing scheme. While the statute is specific as to musicians and vocalists being entitled to royalties per Sections 114(g)(2)(B) and (C), it uses the more expansive term of "artist" to refer to those that are entitled to royalties under Section 114(g)(2)(D). And the parties do not dispute that El Gran Combo is an artist and is an artist that is different from Aponte. As such, the Court deems that, per the text of the statute, the band El Gran Combo may be a "featured artist" under Section 114(g)(2)(D).[1] See Bonneville Intern. Corp. v. Peters, 347 F.3d 484, 491 (3d Cir. 2003) (first step of statutory construction is the text of the statute). Aponte's argument regarding the definition of the action to "perform" under the U.S. Copyright Act is unpersuasive. The definition taken literally does appear to include actions that

---

[1] The parties do not dispute that SoundExchange defines "artists" as "the group, band, or individual name as it appears on the release of the recording"

can only be carried out by human beings. But to take that definition literally and insert it into Section 114 for purposes of excluding the band as a potential artist to be featured would be to ignore the explicit distinction that Section 114(g)(2)(D) makes when it uses the term "artist" rather than musicians or vocalists to refer to those that may be featured.[2] Under Aponte's logic, because all members of the band are automatically featured when the band itself is featured, the sections of the statute that provide for the payment of royalties to nonfeatured musicians and nonfeatured vocalists would be superfluous, at least as these relate to El Gran Combo.[3] Furthermore, under Aponte's logic a band alone (that is, the owner of the band) would never be entitled to the royalties under Section 114(g)(2)(D) regardless of whether the band is the only featured artist.[4] This result would be wholly inconsistent with the purpose of the amendments set forth by the Digital Performance Right in Sound Recordings Act of 1995; to grant **performing artists, record companies and copyright owners of sound recordings** digital audio transmission performance rights, **including the right to receive the payment of royalties on account of the statutory licenses created by the statute**. See S.Rep. 104-128 (1995) at p. 357 (emphasis added).

Nowhere in the statute is there an exclusion of vocalists (e.g., lead singers) in the "nonfeatured vocalist" group referred to in Section 114(g)(2)(C). The Court can only speculate as to why the SoundExchange website includes the letters "i.e.," rather than "e.g.," when it refers to some of the categories of artists (namely, session musicians or backup vocalists) that could be "nonfeatured artists". But the Court cannot assume, as Aponte proposes, that Congress' use of the term "nonfeatured vocalists" in Section 114(g)(2)(C) was intended to exclude lead singers. On the contrary, because Section 114(g)(2)(C)'s reference is to "nonfeatured vocalists" and a lead singer (featured or not) is a vocalist, the Court cannot but conclude that the statute contemplates the payment of royalties to nonfeatured lead singers under Section 114(g)(2)(C). See e.g., Bonneville

---

[2]     Indeed, the Senate Report No. 104-128 dated August 4, 1995, in its analysis of Section 114(g)(2) distinguishes between nonfeatured musicians and nonfeatured vocalists "who have performed on sound recordings" in subparagraphs (B) and (C) and "featured artists or artists" (without reference to a performance) that are entitled to 45% of proceeds generated from royalties. See S.Rep. 104-128 (1995) at p. 378.

[3]     El Gran Combo has three singers, two saxophone players, two trumpet players, a trombone player, a bass player, a pianist, a timbales player, a conga player, a bong player, and a director. DSMF at ¶ 3. If Aponte's argument were correct, all members of the band would be "featured artists" and non would be nonfeatured musicians and nonfeatured vocalists.

[4]     Under Aponte's interpretation, the band would never be entitled to at least 50% of the royalties as it would not fall under the categories of musicians and vocalists in Sections 114(g)(2)(B) and (C) either.

Intern. Corp. v. Peters, 347 F.3d at 499 (more than congressional silence required in interpreting Section 114 of the Digital Performance Right in Sound Recordings Act of 1995). The foregoing is consistent with the legislative history of the Digital Performance Right in Sound Recordings Act of 1995. In Congress' analysis prior to approving the statute, the Senate Report clarified the following with respect to the term "featured recording artist" as used in another subsection of Section 114:

> The term "featured recording artist" means the performing group or ensemble or, if not a group or ensemble, the individual performer, **identified most prominently in print on, or otherwise in connection with, the phonorecord actually being performed.** Except in the case of a sound recording consisting of a compilation of sound recordings by more than one performer or group or ensemble, **there will ordinarily be only one "featured recording artist" per phonorecord. A vocalist or soloist performing along with a group or ensemble is not a "featured recording artist" unless that person is identified in connection with the phonorecord as the primary performer.** For example, the Eagles would be the "featured recording artist" on a track from an Eagles album that does not feature Don Henley by name with equal prominence; but if the same sound recording were performed from "Don Henley's Greatest Hits," then Don Henley and not the Eagles would be the "featured recording artist." Where both the vocalist or soloist and the group or ensemble are identified as a single entity and with equal prominence (such as "Diana Ross and the Supremes"), both the individual and the group qualify as the "featured recording artist." S. REP. 104-128, 36, 1995 U.S.C.C.A.N. 356, 383.

This same explanation was included in the Proceedings and Debates of the 104th Congress, First Session dated August 8, 1995. 141 Cong. Rec. S11945-04 at S11956-S11957 (1995). Per the foregoing explanation and concrete example in the legislative history of Section 114, lead singers such as Aponte may be featured recording artists if they are in fact featured; otherwise only the band would be the featured recording artist. See e.g., Bonneville Intern. Corp. v. Peters, 347 F.3d at 495-497 (considering other sections of the statute and legislative history to draw conclusions on statutory interpretation of Section 114).

There is no dispute that the band El Gran Combo was the artist "most prominently included in print on, or otherwise in connection with, the phonorecord actually being performed." Aponte's name was not featured in album covers or otherwise promoted as the main attraction for live

Rafael Ithier, et al. v. Carlos Juan Aponte, et al.
Civil No. 19-2053 (JAG)

audiences. There is nothing to conclude that El Gran Combo and Aponte were featured by name with equal prominence. The Court thus concludes that the band El Gran Combo (and, consequently, its owner) is the artist featured in the El Gran Combo sound recordings entitled to 45% of the proceeds of royalties as set forth in 17 U.S.C. § 114(g)(2)(D).

### IV.    Conclusion

For the reasons discussed above, the Court recommends that Aponte's motion for summary judgment at Docket No. 20 be **DENIED** and that Ithier's motion for summary judgment at Docket No. 23 be **GRANTED**, and that the Court issue a declaration consistent with this recommendation.

This Report and Recommendation is issued pursuant to 28 U.S.C. §636(b)(1) and Rule 72(d) of the Local Rules of this District Court. Pursuant to Local Rule 72(d), the parties have fourteen (14) days to file any objections to this Report and Recommendation. Failure to file timely and specific objections within the specified time waives the right to review in the District Court and those claims not preserved by such objections are precluded on appeal. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccarone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Secretary of Health and Human Services, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 19th day of September 2022.

s/Giselle López-Soler
GISELLE LÓPEZ-SOLER
United States Magistrate Judge

9

```
MIME-Version:1.0
From:prd_docketing@prd.uscourts.gov
To:prd_docketing@prd.uscourts.gov
Bcc:
--Case Participants: Jose A. Hernandez-Mayoral (jose@hernandezmayoral.com), Patricia
Rivera-MacMurray (prm3@mac.com), Roberto Sueiro-Del-Valle (rsdv@me.com,
sueirolaw@me.com), Judge Jay A. Garcia-Gregory (prd_jag@prd.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:<7832952@prd.uscourts.gov>
Subject:Activity in Case 3:19-cv-02053-JAG Ithier et al v. Aponte et al Order
Adopting Report and Recommendation
Content-Type: text/html
```

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## United States District Court

## District of Puerto Rico

### Notice of Electronic Filing

The following transaction was entered on 9/30/2022 at 1:29 PM AST and filed on 9/30/2022

**Case Name:**      Ithier et al v. Aponte et al
**Case Number:**   3:19-cv-02053-JAG
**Filer:**
**Document Number:** 40(No document attached)

**Docket Text:**
**ORDER adopting [37] Report and Recommendation; denying [20] Defendant's Motion for Summary Judgment; granting [23] Plaintiff's Motion for Summary Judgment. After considering Defendant's Objection, Docket No. [39], and conducting a *de novo* review of the record, the Court finds that the R&R is supported by both the facts and the law. In his objection, Defendant argues that the Magistrate Judge misconstrued his argument, which is that El Gran Combo as a band is entitled to the royalties as a featured artist and that the band refers to its members, not the owner. In support of this argument, Defendant cites an email from the Senior Corporate Paralegal at Sound Exchange, Docket No. 24-22, and argues that "[w]here Congress has entrusted rulemaking and administrative authority to an agency, courts normally accord the agency particular deference in respect to the interpretation of regulations promulgated under that authority," *S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97 (1st Cir. 2002) (cleaned up). However, the email is not dispositive because it is not an official interpretation of Sound Exchange, but merely the opinion of an employee. Moreover, the statute does not grant rulemaking authority to an agency, but merely charges "a nonprofit collective designated by the Copyright Royalty**

Judges [i.e. Sound Exchange] to distribute receipts from the licensing of transmissions." 17 U.S.C. � 114(g)(2). El Gran Combo, organized as a corporation, is a distinct legal entity that employs the musicians that compose the band. As the group most prominently featured on the sound recordings, the corporation is entitled to collect royalties as the featured artist and Plaintiff is the sole owner of that corporation. Accordingly, the Court ADOPTS the Magistrate Judge's R&R, denies Defendant's Motion for Summary Judgment, and grants Plaintiff's Motion for Summary Judgment. Declaratory Judgment shall be entered accordingly. Signed by Judge Jay A. Garcia-Gregory on 9/30/2022. (MQ)

**3:19-cv-02053-JAG Notice has been electronically mailed to:**

Jose A. Hernandez-Mayoral     jose@hernandezmayoral.com

Roberto Sueiro-Del-Valle     sueirolaw@me.com, rsdv@me.com

Patricia Rivera-MacMurray     prm3@mac.com

**3:19-cv-02053-JAG Notice has been delivered by other means to:**

**ADDENDUM 011**                                                            **APPENDIX 505**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

RAFAEL ITHIER,

    **Plaintiff,**

        v.

CARLOS JUAN APONTE, *et al.*,

    **Defendants.**

**CIVIL NO. 19-2053(JAG)**

### JUDGMENT

Pursuant to this Order, Docket No. 40, Judgment is hereby entered granting declaratory relief in favor of Plaintiff Rafael Ithier. The Court hereby holds that (i) El Gran Combo, a distinct legal entity organized as a corporation, is the group most prominently featured on the sound recordings and, thus, is entitled to collect the royalties as the featured artist; and (ii) Rafael Ithier, as the sole owner of El Gran Combo, is entitled to collect the featured artist royalties due to the corporation. The case is now closed for statistical purposes.

IT IS SO ORDERED.

In San Juan, Puerto Rico this Friday, September 30, 2022.

<u>s/ Jay A. Garcia-Gregory</u>
JAY A. GARCIA-GREGORY
U.S. DISTRICT JUDGE