No. 22-1859

In The
# United States Court of Appeals for the First Circuit

RAFAEL ITHIER; EGC, CORP. A/K/A EL GRAN COMBO,

*Plaintiffs-Appellees,*

v.

CARLOS JUAN APONTE-CRUZ A/K/A CHARLIE APONTE,

*Defendant-Appellant,*

JANE DOE; ABC INSURANCE COMPANY; COMPANY XYZ; RICHARD
DOE; MARY ROE; CONJUGAL PARTNERSHIP APONTE-DOE;
CONJUGAL PARTNERSHIP DOE-ROE,

*Defendants.*

On Appeal from the United States District Court for the District of Puerto Rico,
Case No. 3:19-cv-02053-JAG

**BRIEF OF SOUNDEXCHANGE, INC., THE AMERICAN FEDERATION OF
MUSICIANS OF THE UNITED STATES AND CANADA, AND SCREEN
ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO
ARTISTS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT**

Tim Dadson
*General Counsel*
Brieanne Jackson
*Deputy General Counsel*
SoundExchange, Inc.
733 10th Street, NW
10th Floor
Washington, D.C. 20001
Tel: (202) 640-5858

Matthew S. Hellman
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, D.C. 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
MHellman@jenner.com

*Counsel for Amici Curiae*
*(Additional counsel listed on inside cover)*

Jennifer P. Garner
American Federation of
Musicians of the United
States and Canada
1501 Broadway, 9th Floor
New York, NY 10036
Tel: 212-869-1330

Jeffrey P. Bennett
Danielle S. Van Lier
SAG-AFTRA
5757 Wilshire Blvd.,7th Fl.
Los Angeles, CA 90036
Tel: (323) 549-6627

Steven R. Englund
Eric E. Petry
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, D.C. 20001
Tel: (202) 639-6000

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* submit the following corporate disclosure statement:

SoundExchange, Inc. ("SoundExchange") is a non-profit performance rights organization representing the owners of sound recording copyrights and the recording artists who performed on those recordings. SoundExchange collects royalties paid pursuant to the statutory license under Section 114 of the Copyright Act, 17 U.S.C. § 114, which allows the public performance of sound recordings by means of certain digital audio transmissions. SoundExchange distributes these royalties to the artists who performed on the sound recordings and the copyright owners of the sound recordings. SoundExchange has not issued any shares or debt securities to the public, and SoundExchange has no parent companies. SoundExchange has no subsidiaries or affiliates that have issued any shares or debt securities to the public. No publicly-held company has any ownership interest in SoundExchange.

Because SoundExchange distributes statutory royalties to artists and copyright owners, some of those artists and owners may have an interest in the outcome of this case, because the Court's decision may affect their

entitlement to statutory royalties. Certain publicly-traded companies receive, directly or indirectly through a subsidiary, royalties distributed by SoundExchange.

The American Federation of Musicians of the United States and Canada and Screen Actors Guild-American Federation of Television and Radio Artists are non-profit corporations; they do not offer stock; and they have no parent corporations.

## RULE 29 STATEMENTS

*Amici* submit this brief with an accompanying motion for leave to file pursuant to Federal Rule of Appellate Procedure 29(a)(3). No part of this brief was authored, in whole or in part, by counsel for any party. No person, including but not limited to any party or party's counsel, other than *Amici*, contributed any money to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................. i

RULE 29 STATEMENTS ................................................................ iii

TABLE OF AUTHORITIES ............................................................ v

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................... 1

SUMMARY OF ARGUMENT .......................................................... 5

BACKGROUND ........................................................................ 7

ARGUMENT ........................................................................... 10

I.    The Recording Artists Featured On A Recording Are Natural Persons Who Create Art By Performing. ............................ 10

    A.    Section 114(g)(2)(D) Requires Allocation Of Featured Artist Royalties To Actual Recording Artists. ........................ 10

    B.    Section 114(g)(2) Was Specifically Designed To Ensure Payment To Artists Under The Statutory License. .................. 19

II.    SoundExchange Distribution Policies And Practices Are Intended To Ensure That Only Actual Recording Artists Are Paid Statutory Royalties. ............................................ 21

CONCLUSION ........................................................................ 28

CERTIFICATE OF COMPLIANCE ................................................. 30

CERTIFICATE OF SERVICE ......................................................... 31

# TABLE OF AUTHORITIES

CASES

*Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005) ...................................................................................14

*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007)..........................................14

*Matamoros v. Starbucks Corp.*, 699 F.3d 129 (1st Cir. 2012)............13, 18, 19

*Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68 (1st Cir. 2002)...............................................................13

*Stauffer v. IRS*, 939 F.3d 1 (1st Cir. 2019).......................................16

STATUTES

17 U.S.C § 101 ...............................................................................12

17 U.S.C. § 114(d)(2)(A)(i)................................................................10

17 U.S.C. § 114(d)(2)(B)(i)................................................................17

17 U.S.C. § 114(d)(2)(C)(i)................................................................17

17 U.S.C. § 114(g)(2)(D)................................................................11, 18

17 U.S.C. § 114(j)(7) ........................................................................10

17 U.S.C. § 114(j)(13) ......................................................................17

Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336 ..............................................20

Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321, 116 Stat. 2780, 2784-85...........................................................21

LEGISLATIVE MATERIALS

S. Rep. No. 104-128 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 356..........................................................................16, 17. 18, 20

# OTHER AUTHORITIES

37 C.F.R. § 380.2(a) ...........................................................1, 10

37 C.F.R. § 382.3(a) ...........................................................1, 10

*2022 GRAMMYs Awards Show: Complete Winners &*
*Nominations List* (Nov. 23, 2021), https://www.grammy.com/
news/2022-grammys-complete-winners-nominees-nominatio
ns-list ...........................................................................................13

*American Heritage Dictionary of the English Language* (4th ed.
2000) ........................................................................................8, 11

*Webster's Third New International Dictionary* (1993) ...............8, 11

## IDENTITY AND INTEREST OF *AMICI CURIAE*

SoundExchange, Inc. ("SoundExchange") is an independent, non-profit performance rights organization established to ensure the prompt, fair and efficient collection and distribution of royalties payable to recording artists and sound recording copyright owners for the use of their recordings under the statutory license in Section 114 of the U.S. Copyright Act (17 U.S.C. § 114).[1]  The Copyright Royalty Board, a federal administrative agency with rulemaking authority over the Section 114 statutory license, has consistently designated SoundExchange as the sole collective to receive statutory royalty payments and usage data from digital music services and to distribute such royalty payments to recording artists and copyright owners.  *See, e.g.*, 37 C.F.R. §§ 380.2(a), 382.3(a).  As such, SoundExchange collects and distributes statutory royalties on behalf of hundreds of thousands of music creators.  SoundExchange also works with performing rights organizations in over 50 other countries to collect royalties for artists and rights owners when their recordings are played abroad and to remit

_____

[1] SoundExchange was originally formed in the late 1990s as a division of the Recording Industry Association of America, Inc.  However, it has been its own separately-incorporated and independent organization since 2003.

payments to foreign artists and copyright owners when their recordings are used in the United States.

SoundExchange is governed by an 18-member Board of Directors that is broadly representative of the recorded music industry. It is made up of equal numbers of recording artist representatives and sound recording copyright owner representatives. Copyright owners are represented by board members associated with the major record companies, independent record companies, and trade associations of record companies. Artists are represented by actual recording artists, lawyers and managers who represent artists, and leaders of the two main music industry labor unions who join SoundExchange as *Amici*.

This case presents the question of who is (or are) the recording artist or artists featured on the recordings of El Gran Combo de Puerto Rico ("El Gran Combo") entitled to receive statutory royalties under Section 114(g)(2)(D). That is a kind of question that SoundExchange regularly confronts in its role of administering the Section 114 statutory license. As a result, SoundExchange has spent the last 20 years developing industry-consensus policies and practices for distributing statutory royalties to recording artists that include identification of featured artist payees. This

experience makes SoundExchange uniquely qualified to address the settled recording industry understanding of who is a recording artist entitled to receive statutory royalties under Section 114(g)(2)(D).

In addition, this Court's decision could have significant implications for SoundExchange's operations going forward. Many recording artists perform as groups. When recordings feature a group, it is always necessary to determine who are the recording artists featured on the group's recordings. El Gran Combo is not unique in having a manager (Mr. Ithier) who is not always a performer.[2] The same is true of symphony orchestras and numerous bands assembled by talent managers or record producers. The Court's decision in this case could potentially affect allocation and distribution of royalties for all such groups.

Given SoundExchange's role, it is not surprising that SoundExchange figured prominently in the proceeding below. Indeed, the Magistrate Judge's Report and Recommendation adopted by the district court refers to SoundExchange a dozen times. SoundExchange provides this brief to make clear that it disagrees with the district court's decision and believes that

---

[2] SoundExchange understands that Mr. Ithier is or was the music director of El Gran Combo and also was credited as pianist on some of the group's recordings.

natural persons who perform as members of a group like El Gran Combo are the recording artists featured on the group's recordings who are entitled to receive 45% of the statutory royalties generated by those recordings under Section 114(g)(2)(D).

The American Federation of Musicians of the United States and Canada ("AFM") is the largest organization in the world representing the interests of professional musicians, including the interests of featured artists and session musicians. AFM represents over 80,000 musicians who perform in orchestras, backup bands, festivals, clubs and theaters and make music for films, television, commercials and sound recordings.

Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA") is the nation's largest labor union representing working media artists. SAG-AFTRA represents more than 160,000 recording artists, singers, actors, announcers, broadcasters, journalists, DJs, program hosts, voiceover artists, and other media professionals.

As the preeminent labor unions representing performing artists, many of whom receive royalties through SoundExchange as artists and/or rights owners, AFM and SAG-AFTRA have unique insight into the impact this case may have. The outcome of this case will affect the livelihood of countless

artists and rights owners who derive a significant portion of their income from statutory royalties.

## SUMMARY OF ARGUMENT

Creation of commercial sound recordings generally depends on the creative talents of multiple recording artists. Common recording industry parlance incorporated into Section 114 recognizes that the performances of a solo artist or primary named group of artists are "featured," while the performances of *ad hoc* contributors referred to as "session" or "background" musicians or vocalists are "nonfeatured." While performing groups come in many sizes and forms, SoundExchange's experience is that it is rarely difficult to identify the members of a group featured on a recording or to distinguish the group members from background musicians and vocalists who contributed to a recording at a particular session but were not members of a featured group. Section 114(g)(2)(D) commands that SoundExchange distribute 45% of statutory royalties to the solo artist, or members of a group of artists, featured on a recording. That statutory command has been implemented in SoundExchange policies and practices developed over the last 20 years that have been approved by

SoundExchange's Board of Directors and embraced by the recorded music industry.

The decision below represents a radical departure from the Copyright Act's text and history, SoundExchange policy, and industry consensus. The district court held that a corporate entity (ECG, Corp.) is the "recording artist . . . featured on" El Gran Combo's recordings by virtue of the fact that the corporation controlled the El Gran Combo name and arranged its performances. Accordingly, the district court found that the corporation's owner (Mr. Ithier) is entitled to 45% of statutory royalties to the exclusion of the actual human recording artists that Section 114 was designed to protect.

This decision is incorrect because recording artists are actual human performers. Hence, Section 114(g)(2)(D) requires allocation of the statutory royalties generated by the work of featured performing groups to the members of those groups, rather than to corporations or the managers of such groups. The plain language of Section 114(g), industry practice, legislative history, and the pro-artist policy underlying Section 114(g)(2)(D) all confirm this understanding.

Based on this understanding, SoundExchange has spent the last 20 years developing distribution policies and practices intended to ensure that statutory royalties inure to the benefit of actual recording artists. These policies and practices have wide acceptance in the recording industry, as demonstrated by the approval of SoundExchange's Board. These policies and practices also work within international norms for repatriating performance royalty money. The district court's decision is inconsistent with these policies, practices, and norms. Affirmance of that decision would likely lead to statutory royalty claims from many other managers of groups who are not actually recording artists, potentially disrupting SoundExchange's operations and settled expectations in the recorded music industry.

For these reasons, the district court's decision should be reversed.

## BACKGROUND

While the practices and nomenclature of the recorded music industry may have been unfamiliar to the district court, the roles embodied in Section 114(g)(2) are well-understood in the industry, where the terms used are everyday vernacular.

Recording artists work in various ways to create the recordings their fans love. Some have careers as what are referred to as "solo artists." These are recording artists like Prince, Billy Joel and Adele, whose singing or playing is most prominent on their recordings, whose names (or professional names) and often pictures stand alone on album covers, and whose recordings are marketed and distributed as their own. Because they are the most prominent individuals with respect to their recordings, they are "featured" in the ordinary sense of that word.[3] Yet recordings by "solo artists" rarely embody solo performances. Rather, numerous other artists also usually contribute to their recordings by playing instruments and providing backing vocals. These artists are referred to in the recording industry as "session" or "background" musicians or vocalists because they are typically hired just for a particular recording session and perform in the background (figuratively behind the featured artist). They are said to be "nonfeatured" because they are not the artist who is featured.

Many recording artists do not have solo careers, but rather perform as members of groups. Performing groups come in many sizes and forms,

---

[3] An artist is "featured" when given special prominence. *See* American Heritage Dictionary of the English Language 646 (4th ed. 2000); Webster's Third New International Dictionary 832 (1993).

ranging from small groups of friends who organized themselves into a band and began performing together while still in school (like The Beatles), to commercial groups assembled through auditions by managers or producers (like the Backstreet Boys), to major orchestras (like the Boston Symphony Orchestra).  Like solo artists, these groups sing or play most prominently on their recordings, typically have their group name (and often their picture) on album covers, and have their recordings marketed and distributed as the group's.  Thus, like a solo artist, the group is featured.  But groups regularly collaborate with other artists to create recordings.  For example, The Beatles' recording *A Day in the Life* famously includes overdubs recorded by 40 orchestral musicians.  That recording features The Beatles, while the orchestra performers are recognized in the industry as nonfeatured, background musicians.  Nobody in the industry would view John Lennon, Paul McCartney, George Harrison, and Ringo Starr as nonfeatured performers on *A Day in the Life*.

The Section 114 statutory license allows certain kinds of digital music services to perform copyrighted sound recordings by means of digital audio transmission.  Users of the statutory license include Sirius XM Satellite

Radio and noninteractive internet webcasters like Pandora and iHeart.[4] When the providers of such services rely on the statutory license, they must pay statutory royalties to SoundExchange. *E.g.*, 37 C.F.R. §§ 380.2(a), 382.3(a).

Section 114(g)(2) provides the instructions that SoundExchange uses to distribute such statutory royalties. Section 114(g)(2) was designed to provide fair compensation to all the parties in interest with respect to a recording used under the statutory license: copyright owners, featured artists, and the background artists who also contribute to recordings.

## ARGUMENT

### I. The Recording Artists Featured On A Recording Are Natural Persons Who Create Art By Performing.

#### A. Section 114(g)(2)(D) Requires Allocation Of Featured Artist Royalties To Actual Recording Artists.

The district court below erred in finding that when a group is featured on a recording, the owner of the name of the group gets the featured artist

---

[4] Noninteractive in this context means, among other things, that the user cannot pick the particular recordings she wants to listen to. *See* 17 U.S.C. § 114(j)(7). Instead, somewhat like AM/FM radio, the webcaster streams a series of recordings of its choosing, typically from a particular genre (pop, country, jazz, etc.). Interactive services like Spotify that allow the user to pick the recordings she wants to hear are not eligible for the statutory license. 17 U.S.C. § 114(d)(2)(A)(i).

royalties under 17 U.S.C. § 114(g)(2)(D).  Section 114(g)(2)(D) requires that 45% of the royalties from performances of sound recordings go "to the recording artist or artists featured on [the] sound recording."  The statutory scheme Congress enacted to allocate the rest of the statutory royalties dictates that copyright owners get 50% of the royalties (per Section 114(g)(2)(A)), while nonfeatured artists who performed on the sound recording get the remaining 5% of the royalties (per Sections 114(g)(2)(B) and (C)).  Under this scheme, a recording artist who is "featured" is one or more natural person(s), not a group name or its owner.  The plain meaning of the statute, industry practice, and legislative history all confirm this understanding.

The text of Section 114(g) is clear and unambiguous: the "recording artist or [recording] artists featured" on a sound recording are one or more natural person(s).  Simply put, an artist is someone, a human person, who creates art.  *E.g.*, *Webster's Third New International Dictionary* 125 (1993) ("one who professes and practices an art"; "a performer of music"); *American Heritage Dictionary of the English Language* 102 (4th ed. 2000) ("A person whose work shows exceptional creative ability or skill"; "One, such as an actor or singer, who works in the performing arts").

Section 114(g) embodies this definition through its repeated references to artists as active participants in the creation of music. Section 114(g)(1), for example, refers to "a featured recording artist *who performs on a sound recording*," while Section 114(g)(2)(C) refers to "nonfeatured vocalists . . . *who have performed on sound recordings*." (emphasis added.) Section 114(g)(2)(D) likewise contemplates "recording artists" who are "featured *on* such sound recording[s]." (emphasis added.) These acts of performing and recording, which are the creation of art, are the province of natural persons. *See* 17 U.S.C. § 101 ("To 'perform' a work 'means to recite, render, play, dance, or act it, either directly or by means of any device or process.'") To be sure, groups of natural persons may perform or otherwise collaborate together to produce a single work of art. But nonetheless, it is the members of the group who create art, not whatever disembodied name applies to them. The statute's repeated references to artists creating art leaves room for only one interpretation: artists, including "featured" artists, are natural persons.

Common usage within the recording industry confirms that the term artist refers to human performers. For example, recording contracts entered into directly between record companies and performers typically

use the defined term "Artist" to refer to the performers. And when a record company enters into a recording contract with a non-performer, such as an artist's "loan-out" company[5] or a producer that has the exclusive right to the artist's services, the contract typically will use a defined term like "Producer" to refer to the contractual counterparty and the defined term "Artist" to refer to the performer. Similarly, the Grammy Awards for "Record Of The Year" and "Best New Artist" are awards for human artists, or groups of human artists, not corporations or non-performers. *See 2022 GRAMMYs Awards Show: Complete Winners & Nominations List* (Nov. 23, 2021), https://www.grammy.com/news/2022-grammys-complete-winners-nominees-nominations-list.

When a commonly understood and accepted term of art exists within an industry, courts routinely adopt its meaning. *See Matamoros v. Starbucks Corp.*, 699 F.3d 129, 135 (1st Cir. 2012) (adopting the meaning of "shift supervisors" as a term of art within the restaurant industry); *Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68, 71 & n.1 (1st Cir. 2002) (adopting the meaning of "unbranded fuel oil" as a "term[] of art

---

[5] A loan-out company is a corporate entity formed by an artist to carry out the artist's business in a tax-efficient manner. The entity typically enters into contracts on behalf of the artist and then "loans out" the artist's services.

in the petroleum industry"). Terms of art within the recording industry are no exception. *See Davis v. Blige*, 505 F.3d 90, 94 & n.2 (2d Cir. 2007) (adopting the accepted meaning of "'[p]latinum' status, a term of art of musical-recording sales certification"); *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 798 (6th Cir. 2005) (adopting "the definition commonly accepted within the industry" of "'digital sampling' which is a term of art well understood by the parties to this litigation and the music industry in general").

The concerns the district court cited in reaching the opposite conclusion were misguided and misplaced.

Treating the members of a group as featured artists does not render Sections 114(g)(2)(B) and (C) superfluous. While Section 114(g)(2)(D) guarantees 45% of statutory royalties to the featured group members, Sections 114(g)(2)(B) and (C) serve the distinct purpose of guaranteeing 5% of statutory royalties to the background musicians and vocalists who typically perform on recordings, even when a recognized group is featured. The district court was concerned about the possibility that if all members of El Gran Combo were considered featured on the group's recordings under Section 114(g)(2)(D), "non [sic] would be nonfeatured musicians and

nonfeatured vocalists." Report and Recommendation at 7 & n.3, ECF No. 37. But there is no problem with that outcome. Like other featured artists, the members of El Gran Combo sometimes record with background artists who are not members of the group. Brief for Plaintiff-Appellant Carlos Juan Aponte-Cruz at 2. It is them, not the members of El Gran Combo, that Sections 114(g)(2)(B) and (C) were intended to remunerate. Treating members of a featured group as nonfeatured artists would diminish the already-small pool of royalties available for background artists.

Nor does treating El Gran Combo members as featured artists necessarily leave Mr. Ithier uncompensated. First, SoundExchange understands that he was a member of the group who performed as pianist on some of the group's recordings. Like other group members who performed on those recordings, he is entitled to his share of the featured artist royalties generated by those recordings. In addition, SoundExchange understands that ECG, Corp. may be the copyright owner of at least some El Gran Combo recordings. *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment & Cross Motion for Summary Judgment at 18-19, ECF No. 23; Brief for Plaintiff-Appellant Carlos Juan Aponte-Cruz at 14-15. As such, Mr. Ithier would be entitled to 50% of statutory royalties for those

El Gran Combo recordings under Section 114(g)(2)(A), as well as whatever share of featured artist royalties he may be entitled to under Section 114(g)(2)(D).

Finally, although there is no need to resort to other tools of statutory construction given the lack of ambiguity in the text of Section 114(g), the legislative history is consistent with the statute's plain meaning. *See Stauffer v. IRS*, 939 F.3d 1, 7 (1st Cir. 2019) ("If the statute's language is plain, the sole function of the courts is to enforce it according to its terms. However, if the language is not plain and unambiguous, we then turn to other tools of statutory construction, such as legislative history." (internal quotation marks omitted)).

The district court relied in part on a Senate Report from 1995. The portion of that report addressing Section 114(g)(2) simply parrots the bill text as it existed at that time. *See* S. Rep. No. 104-128, at 31 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 356, 378. And the references to artists throughout the report are fully consistent with the normal meaning of artist as a human being who creates art. *E.g.*, *id.* at 2 & 14, 1995 U.S.C.C.A.N. at 361 (discussing the purpose of the bill to protect the livelihoods of artists),

*id.* at 12, 1995 U.S.C.C.A.N. at 359 (identifying Don Henley as "an individual recording artist").

The portion of the report relied on by the district court addresses a separate, unrelated provision in Section 114 describing the "sound recording performance complement"—a rule limiting the number of times within a three-hour period that a statutory licensee can play recordings from the same album or "featured recording artist." *See* 17 U.S.C. § 114(d)(2)(B)(i), (C)(i), (j)(13). The example the Senate Report uses is directed to the practical problems that a radio station or other service provider playing a recording from a physical album in 1995, or more recently playing a digital file with limited accompanying metadata, has tracking compliance with the performance complement. In explaining the featured recording artist concept in that context, the Report says:

> the Eagles would be the "featured recording artist" on a track from an Eagles album that does not feature Don Henley by name with equal prominence; but if the same sound recording were performed from "Don Henley's Greatest Hits," then Don Henley and not the Eagles would be the "featured recording artist." Where both the vocalist or soloist and the group or ensemble are identified as a single entity and with equal prominence (such as "Diana Ross and the Supremes"), both the individual and the group qualify as the "featured recording artist."

S. Rep. No. 104-128, at 36, 1995 U.S.C.C.A.N. at 383. According to the district court, this quote means that, unless a lead singer is specifically singled out, "only the band would be the featured recording artist." Report and Recommendation at 8.

However, the term "featured recording artist," which is used in prescribing the performance complement in Section 114(j)(13)(B)(i), does not actually appear in Section 114(g)(2)(D), which instead requires payment "to the recording artist or artists featured on [a] sound recording." And the district court appears to have missed the point that under Section 114(g)(2)(D), Mr. Henley and all the members of the Eagles who performed on a particular recording will receive shares of Section 114(d)(2)(D) royalties for the recordings on which they made featured performances regardless of whether those recordings are played from an Eagles CD or LP, a *Don Henley's Greatest Hits* CD or LP, or a digital file obtained by other means.[6]

Where, as here, "all roads lead to Rome," with "[t]he plain language of the [statute], the legislative purpose underlying it, and" an industry term of art all coalescing around the same meaning, there is "no other plausible

---

[6] SoundExchange does not have any visibility into the physical media used by statutory licensees to render their performances.

conclusion." *Matamoros*, 699 F.3d at 137. This Court accordingly should reverse the district court's decision.

### B. Section 114(g)(2) Was Specifically Designed To Ensure Payment To Artists Under The Statutory License.

That Section 114(g)(2)(D) requires allocation of featured artist statutory royalties to actual human recording artists is particularly clear when the provision is understood in context, because Section 114(g)(2) reflects a strong federal policy of protecting artist royalties from claims of corporations with which artists may have contractual relationships.

Recording artists traditionally were paid only in accordance with the contracts pursuant to which they performed. Section 114(g)(1) preserves that arrangement when a statutory license does not apply. Recording artists who are featured on commercial recordings often have recording contracts with record companies pursuant to which they are paid a percentage royalty after the record company recovers certain of its costs, including any advance payment to the artist. Because of the cost recovery provision, featured artists may never receive royalties under their contracts. Background musicians and vocalists who appear on commercial recordings are often unionized. Pursuant to union agreements, in the first instance, they are simply paid for their time spent recording, although they may later receive

certain additional payments for subsequent uses of their work. Non-union performers may receive less. This arrangement represented the status quo when Congress created the Section 114 statutory license as part of the Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336.

Section 114(g)(2) is different from Section 114(g)(1) because Congress decided that royalties under the new statutory license should be allocated differently to protect recording artists. *See* S. Rep. No. 104-128, at 10, 13 (1995), 1995 U.S.C.C.A.N. at 357, 360. While Congress initially envisioned statutory royalties flowing through copyright owners like record companies, rather than a collective like SoundExchange, recording artists who are featured on commercial recordings were assured 45% of statutory royalties notwithstanding recording contracts that might provide for a lesser percentage.[7] For the first time, all background musicians and vocalists (union and non-union) were assured royalties for the use of the recordings to which they contributed. *See* 109 Stat. at 342-43.

---

[7] An agreement between the unions and major record companies also negated cost recovery before distribution of royalties by record companies.

In 2002, Congress amended Section 114(g)(2) to provide even more protection to recording artists by codifying arrangements to pay them directly through a collective like SoundExchange, rather than through record companies and other copyright owners. *See* Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321, 116 Stat. 2780, 2784-85. This amendment reflected a determination that the actual human beings who performed on a recording should be compensated fully and promptly for its use regardless of whatever contractual arrangements they may have made with record companies, producers, managers, or bandleaders. The decision below is inconsistent with that policy because it would compensate non-performers for the contributions of actual performers. The decision should be reversed.

## II. SoundExchange Distribution Policies And Practices Are Intended To Ensure That Only Actual Recording Artists Are Paid Statutory Royalties.

It is reasonable to think of El Gran Combo as a "featured artist," but the district court's decision that El Gran Combo is EGC, Corp. or Mr. Ithier, rather than the actual recording artists who make up El Gran Combo and are featured on El Gran Combo recordings, is a radical departure from the distribution policies and practices that SoundExchange has implemented

over the last 20 years based on Section 114(g)(2)(D) and international recording industry norms.

In essence, the district court treated El Gran Combo as a disembodied name, and held that the owner of the name *is* El Gran Combo. But that is not how music fans think about the performing groups they love. No music fan would say that Apple Corps Ltd., the company the members of The Beatles formed to carry on their business affairs, *is* The Beatles. Rather, The Beatles are John Lennon, Paul McCartney, George Harrison, and Ringo Starr. Similarly, no music fan would say that Lou Pearlman, the record producer who formed the Backstreet Boys, *is* the Backstreet Boys. Likewise, SoundExchange's distribution policies and practices and the international system for distributing performance royalties are all based on the premise that a featured performing group is its members.[8]

---

[8] Upon instructions from an actual human recording artist, SoundExchange will remit payment of the artist's allocated share of statutory royalties to a loan-out company wholly owned by the artist. SoundExchange understands such a loan-out company to be what Section 114(g)(2)(D) means when it parenthetically refers to a person "conveying rights in the artists' performance." However, such remittance is a convenience to the artist, not a means of depriving the artist of the benefit of the royalties derived from the artist's performance.

Thus, identifying the payees to whom SoundExchange will distribute statutory royalties pursuant to Section 114(g)(2)(D) begins (but does not necessarily end) with identifying the individual(s) or group featured on a recording and its packaging and promotion when the recording is released. Determining the proper payee is easiest in the case of a solo artist. For example, Adele is a superstar artist whose album *21* topped the charts in more than 30 countries. She is clearly the recording artist featured on each of the recordings on the album and entitled to royalties under Section 114(g)(2)(D). Dozens of other artists also contributed to those recordings. Most of them were instrumentalists who played on one or a few tracks, but on many of the tracks, there was a backing choir as well. These performers are the nonfeatured musicians who are entitled to payment under Sections 114(g)(2)(B) and (C).

When SoundExchange allocates statutory royalties, groups present complications that solo artists do not. For example, some groups are named after their lead artists (*e.g.*, Daughtry, Santana, Van Halen). Yet the names on their album covers are well-understood to refer to the group, not just the eponymous lead; all the members of the group sing or play with prominence on their recordings; and their recordings are marketed and distributed as

the group's.  Thus, the settled industry interpretation of Section 114(g)(2)(D) reflected in SoundExchange's distribution policies and practices is that all the members of the group who performed on a recording are entitled to claim royalties under Section 114(g)(2)(D), and not just the namesake lead.

When registering a featured performing group, SoundExchange will only consider the recognized members of the group who performed on a particular recording as the artists entitled to claim royalties under Section 114(g)(2)(D).  It is often the case that when a performing group is successful over time, its membership will evolve.  For example, Mick Fleetwood and John McVie recorded as part of Fleetwood Mac for over 30 years, but over a dozen other recording artists cycled through the group during that time. For example, Stevie Nicks was not yet a member of Fleetwood Mac when it recorded the band's first self-titled album, but she was a member of the group when she performed on *Rumours*.  Thus, SoundExchange considers Ms. Nicks one of the recording artists featured on the recordings from *Rumours*, while it considers Mick Fleetwood, John McVie, Jeremy Spencer, and Peter Green the artists featured on the recordings from the band's first album titled *Fleetwood Mac*.

In each case, SoundExchange endeavors to identify and allocate royalties under Section 114(g)(2)(D) to the actual human recording artists who either were featured as solo artists or are members of a group that was featured. Even in the case of large groups, such as symphony orchestras, SoundExchange's policy is to pay the individual members their shares of statutory royalties under Section 114(g)(2)(D) for the recordings on which they appeared.

When groups receive royalties under Section 114(g)(2)(D), it would be wrong and duplicative for the members of those groups to also claim royalties under Sections 114(g)(2)(B) and (C). Sections 114(g)(2)(B) and (C) are not intended to give a second helping of royalties to the members of featured groups, but instead to reserve royalties for the background musicians and vocalists who also contributed to those recordings.

El Gran Combo is a large performing group that has been active over a long period. It has released dozens of albums over the last 50 years with a lineup of members that has changed over time. El Gran Combo was first registered as an artist to receive royalties from SoundExchange in 2007. It was not clear that the claim for royalties related to "ownership" of the group, and not necessarily the contributions of the performing members of the

group.  SoundExchange began holding the group's royalties in 2016, when Mr. Aponte-Cruz claimed a share of the group's royalties under Section 114(g)(2)(D).  Knowing what it knows today, SoundExchange's policy and practice would be to accept claims by Mr. Ithier for a share of the group's royalties for the recordings on which he performed as a pianist and to accept claims by Mr. Aponte-Cruz for a share of the group's royalties for the recordings on which he performed as lead singer.  Other members of El Gran Combo could also claim shares of the featured artist royalties for the tracks on which they performed.  None of the members of the group should receive royalties under Sections 114(g)(2)(B) and (C) for recordings made while they were group members, because that 5% is for the background musicians and vocalists who contributed to those recordings without being members of El Gran Combo.

SoundExchange fears that affirmance of the decision below would lead to statutory royalty claims from many other managers of groups who are not actually recording artists.  For example, the logic of the district court's decision would seem to support claims by the managers of orchestra and opera companies that have released recordings, to the exclusion of the members that performed on those recordings.  Likewise, the decision would

seem to support claims by talent managers or producers that organized groups like the Backstreet Boys, 'N Sync, and the Spice Girls, to the exclusion of the members of those groups. Redirecting those royalties as suggested by the district court would be contrary to the artist-protective policy of Section 114, disruptive to SoundExchange, and injurious to the group members involved.

The district court's decision presents further practical problems because it is contrary to international norms. To collect from foreign performing rights organizations when recordings by U.S. artists are used abroad, and to pay foreign performing rights organizations when recordings by foreign artists are used in the United States, SoundExchange must operate consistent with international norms built around payment of individual performers. Foreign collectives will not pay SoundExchange at the featured artist level. Nor will they accept payments for their member performers at that level. Rather, exchanges in both directions must be conducted at the level of the individual performer. The district court's decision that El Gran Combo is EGC, Corp. or Mr. Ithier would thus make it difficult for Mr. Aponte-Cruz to access royalties collected outside the United States to which he is entitled under the laws of the countries

involved, even as EGC, Corp. could not get paid by foreign performance rights organizations. These practical consequences, which threaten disruption of settled expectations within the music industry, underscore the importance of correcting the district court's legal error.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order.

Dated: January 10, 2023

Respectfully submitted,

/s/ *Matthew S. Hellman*

Tim Dadson
*General Counsel*
Brieanne Jackson
*Deputy General Counsel*
SoundExchange, Inc.
733 10th Street, NW
10th Floor
Washington, D.C. 20001
Tel: (202) 640-5858

Jennifer P. Garner
American Federation of
Musicians of the United
States and Canada
1501 Broadway, 9th Floor
New York, NY 10036
Tel: 212-869-1330

Jeffrey P. Bennett
Danielle S. Van Lier
SAG-AFTRA
5757 Wilshire Blvd.,7th Fl.
Los Angeles, CA 90036
Tel: (323) 549-6627

Matthew S. Hellman
Steven R. Englund
Eric E. Petry
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, D.C. 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
MHellman@jenner.com

*Counsel for Amici Curiae
SoundExchange, Inc., the American
Federation of Musicians of the
United States and Canada, and
Screen Actors Guild - American
Federation of Television and Radio
Artists*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7), I certify that the foregoing brief has been prepared in Microsoft Word 2016 using 14-point Century Expanded typeface and is double-spaced (except for headings, footnotes, and block quotations). I further certify that the brief is proportionally spaced and contains 5,459 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). Microsoft Word 2016 was used to compute the word count.

Dated: January 10, 2023

/s/ *Matthew S. Hellman*
Matthew S. Hellman

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that, on January 10, 2023, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the First Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.


Dated: January 10, 2023

/s/ *Matthew S. Hellman*
Matthew S. Hellman

*Counsel for Amici Curiae*