No. 22-1859

# In the United States Court of Appeals
## for the First Circuit

RAFAEL ITHIER; EGC CORP., a/k/a El Gran Combo,
*Plaintiffs-Appellees*,

v.

CARLOS JUAN APONTE CRUZ, a/k/a Charlie Aponte,
*Defendant-Appellant*,

JANE DOE; ABC INSURANCE COMPANY; COMPANY XYZ; RICHARD
DOE; MARY ROE; CONJUGAL PARTNERSHIP APONTEDOE;
CONJUGAL PARTNERSHIP DOE-ROE,
*Defendants*.

**On Appeal from the United States District Court
for the District Court of Puerto Rico, San Juan
No. 3:19-cv-02053-JAG**

**RESPONSE ANSWERING BRIEF OF APPELLEES
RAFAEL ITHIER AND EGC CORP.**

ROBERTO SUEIRO DEL VALLE, ESQ.
Tulipán 170, Urb. San Francisco
San Juan, PR 00927-6221
 (787) 753-4712
rsdv@me.com
suerirolaw@me.com

*Counsel for Plaintiffs-Appellees*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

EGC Corp. is a private corporation wholly owned by an individual shareholder. It has no parent corporation. No publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT........................................i

TABLE OF AUTHORITIES ................................................................. iii

I.  JURISDICTIONAL STATEMENT .................................................1

II.  STANDARD OF REVIEW ..............................................................1

III.  STATEMENT OF ISSUES PRESENTED ......................................2

IV.  STATEMENT OF THE CASE ........................................................3

V.  SUMMARY OF THE ARGUMENTS .............................................5

VI.  ARGUMENTS ................................................................................8

Aponte is a Non-Featured Vocalist Under Section 114 ...................................8

El Gran Combo is the "featured artist" under Section 114(g)(2)(D), even if Aponte is a performing band member ...............................................23

VII.  CONCLUSION...............................................................................28

CERTIFICATE OF COMPLIANCE ......................................................29

# TABLE OF AUTHORITIES

## Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)...............................2

Baker v. United States, 27 F.2d 863 (1st Cir. 1928)...............................26

Bonneville Intern. Corp. v. Peters, 347 F.3d 484 (3d Cir. 2003).......................11, 12

Community for Creative Non-Violence v. Reid,
490 U.S. 730 (1989)...............................22

Griffin v. Oceanic Contractors, Inc., 458 U.S. 564,
102 S. Ct. 3245, 73 L.Ed.2d 973 (1982).......................12

Miller v. SunapeeDifference, LLC,
308 F. Supp. 3d  581 (D.N.H. 2018).......................27

Otero-Burgos v. Inter American University,
558 F.3d 1 (1st Cir. 2009).......................23

Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R.
(In re Fin. Oversight & Mgmt. Bd. For P.R.),
37 F.4th 746 (1st Cir. 2022).......................1

Recording Industry Association of America v. Librarian
of Congress, 176 F.3d 528 (D.C. Cir. 1999).......................6

Risto v. Screen Actors Guild- American  Federation
of Television  and  Radio  Artists,  2:18-cv-07241–CAS-PLAx
(C.D.  Cal.  June  14,  2021).......................9, 11

Rossy v. Roche Prods., Inc., 880 F.2d 621 (1st Cir. 1989) .......................2

Sabree v. United Bhd. of Carpenters & Joiners Local No. 33,
921 F.2d 396 (1st Cir. 1990).......................2

Salve Regina College v. Russell, 499 U.S. 225 (1991) .......................1

Scholz v. Goudreau, 901 F.3d 37 (1st Cir. 2018) .....................................................16

SoundExchange, Inc. v. Muzak, LLC,
322 F.Supp.3d 72 (D.D.C. 2018) ..............................................................................6, 7

SoundExchange, Inc. v. Copyright Royalty Board,
904 F.3d 41 (D.C. Cir. 2018) ......................................................................................6

Sullivan v. CIA, 992 F.2d 1249 (1st Cir. 1993).........................................................12

Textron, Inc. v. Comm'r, 336 F.3d 26 (1st Cir. 2003) ........................................11, 12

Whitehouse v. U.S. Dist. Court, 53 F.3d 1349 (1st Cir. 1995)..................................27

**Statutes**

17 U.S.C. § 101 et seq...............................................................................................1, 6

17 U.S.C. § 106(6) .......................................................................................................6

17 U.S.C. § 114 ...........................................................................8, 13, 14, 18, 26

17 U.S.C. § 114(A)(i).................................................................................................10

17 U.S.C. § 114(B) .....................................................................................................10

17 U.S.C. § 114(g)(1)...................................................................................................8

17 U.S.C. § 114(g)(1)(A) ........................................................................................8, 18

17 U.S.C. § 114(g)(2)..........................................................................................7, 8, 24

17 U.S.C. § 114 (g)(2)(A) .......................................................................................9, 14

17 U.S.C. § 114(g)(2)(B) .......................................................................9, 11, 12, 14, 19

17 U.S.C. § 114(g)(2)(C) .................................................... 9, 11, 12, 14, 19, 24, 27

17 U.S.C. § 114(g)(2)(D)........................................ 2, 5, 9, 14, 18, 19, 23, 24, 26, 28

17 U.S.C. § 114(2)(A)(iii)..................................................................10

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1338 ...............................................................................1

**Legislative Materials**

Digital Performance Right in Sound Recordings Act of 1995 ...................18, 24, 25

Proceedings and Debates of the 104th Congress,
First Session dated August 8, 1995. 141 Cong. Rec. S11945-04 (1995) ...............25

S. Rep. 104-128 (1995)....................................................................24, 25

**Regulations**

Copyright Office, 37 C.F.R. Parts 370, 380, 382, 383, and 384.............................10

**Other Authorities**

Don Felder's, Heaven and Hell: My life with the Eagles, Turner Publishing Co.
(2007) .........................................................................................17

Merriam Webster, https://www.merriam-webster.com/dictionary/featured ..........12

Nimmer on Copyright, Sec. 8.22[C][4] ....................................................... 9

Andrew Vaughan, The Eagles: An American Band, Published by Sterling
Publishing Corp., (2010) at 10, 258 (ISBN 1402777124)................................16, 17

VCR Classic Rock and Culture web page, https://ultimateclassicrock.com/eagles-
lineup-changes .............................................................................17

# I. JURISDICTIONAL STATEMENT

The U.S. District Court for the District of Puerto Rico had jurisdiction over the underlying case, Civil No. 00-1338, pursuant to 17 U.S.C. § 101 et seq. and 28 U.S.C. § 1338.

The U.S. Court of Appeals for the First Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The District Court has entered a Final Judgment disposing of all parties' claims on September 30, 2022. Defendant-Appellant's Appendix. (App.) page 506. On October 25, 2022, defendant Carlos Juan Aponte-Cruz filed a timely notice of appeal. App. 507.Hence, this Court has jurisdiction over this appeal because Aponte filed an appeal of a Final Judgment of the U.S. District Court for the District of Puerto Rico on a case presenting a federal question within the District Court's original jurisdiction. The appeal is timely because the Notice of Appeal was filed within thirty days of the District Court's denial of Aponte's motion for reconsideration.

# II. STANDARD OF REVIEW

The standard of review for summary judgment allows for a de Novo review without regard to the conclusions reached by the trial court.  Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 37 F.4th 746, 750-51 (1st Cir. 2022). Salve Regina College v. Russell, 499 U.S. 225, 236 (1991).

A reversal will only be granted if "there existed any factual issues that needed to be resolved before the legal issues could be decided." <u>Sabree v. United Bhd. of Carpenters & Joiners Local No. 33</u>, 921 F.2d 396, 399 (1st Cir. 1990) (quoting <u>Rossy v. Roche Prods., Inc.</u>, 880 F.2d 621, 624 (1st Cir. 1989)); see also <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986) (reversal only if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party"). The parties agreed to a disposition of the case via summary judgment.

### III. STATEMENT OF ISSUES PRESENTED

The issue before this Court is whether Defendant Carlos Juan Aponte (Aponte) is a featured artist entitled to receive royalties under 17 U.S.C. § 114(g)(2)(D). Aponte, conversely, poses the issue differently. He basically argues that as a member of the band El Gran Combo, he is consequently a "featured artist" for purposes of the distribution of royalties under Section 114 of the copyright act." However, as we shall see, his claim for royalties in SoundExchange (SE) was filed as a separate featured artist, not as a member of the band El Gran Combo. This was a stipulated fact noted in the Report & Recommendation. App. 491.

## IV. STATEMENT OF THE CASE

Rafael Ithier founded the musical group El Gran Combo in 1962. Ithier is the sole owner of the group. App. 41 (Def.'s Statement of Material Facts No. 1), admitted in App. 131 (Pl.'s Opp'n to Def.'s Mot. For Summ. J.) Appellee EGC, Corp. is an entity that administers Ithier's ownership rights over El Gran Combo. App. 5 (Compl. ¶ 20). As the owner of El Gran Combo, Rafael Ithier selects the singers and musicians who are members of the band. App. 489 (Report and Recommendation (R&R) Uncontested fact #2) El Gran Combo has been the featured artist in every album recorded while Aponte was part of El Gran Combo. App. 5 (Compl. ¶ 20). Thus, Aponte's name never appeared written as a featured artist on any of El Gran Combo's album covers. App. 489 (R&R Uncontested fact #11).

Aponte, whom El Gran Combo hired in 1973, has admitted that El Gran Combo and Charlie Aponte are two different artists. App. 489 (R&R fact #11) App. 21 (Defendants Answer to Complaint, affirmative defense 1 p. 8) App. 489 (R&R Uncontested fact #11). As such, Aponte submitted in his name the SE royalties claim as a featured artist approximately two years after he had left the group in December 2014. App. 148 (Plaintiff's Statement of Uncontested Facts (PSUMF) #54). Aponte never requested SE featured artist royalties as part of the components of the group El Gran Combo.

3

Aponte has never signed a recording contract on behalf or as a representative of El Gran Combo, has never signed a recording contract assent and guarantee to entitle him to record royalties, has never received royalties as a performing artist with El Gran Combo, and has never received a letter of direction granting a right to get paid performance royalties from SE as a featured artist. App. 148 (PSUMF No 24-36)   While employed by El Gran Combo, Aponte never requested a royalty statement of any kind, including SE. App. 148 (PSUMF No 56, 57). Defendant-Appellee was never paid any royalty or advance by El Gran Combo or any other entity while in the band. App. 148 (PSUMF No 59).  Aponte is also quick to admit that he does not claim any right to compensation for any El Gran Combo master recordings.  Similarly, Aponte has never demanded payment of performance royalties as a featured artist under Section 114 to Ithier as a band member. App. 148 (PSUMF No 1, 2).

The El Gran Combo had an employee manual signed by Aponte admitting his status as an employee without a right to collect royalties.  App. 148 (PSUMF No 31, 32, 53, 59).  The only person with the authority to hire and fire people in the band was Ithier. App. 148 (PSUMF No 46). The ISRC (International Standard Recording Code is a standard code used to identify sound recordings) search engine on the SE welcome page shows El Gran Combo as the featured artist in every album release. App. 148 (PSMF #76)

After Aponte's SE claim, "Ithier" filed for a declaratory judgment seeking a Court determination that the Appellee (as the sole owner of El Gran Combo) has the exclusive right to collect digital performance royalties intended for recording featured artists. App. 1. Aponte filed a counterclaim seeking a declaration that, as a featured artist performer in El Gran Combo sound recordings, he is entitled to participate in the digital performance royalties collected and distributed by SE for the benefit of recording featured artists. App. 21. Both sides filed their respective dispositive motions. The parties agreed that there were no material issues of fact preventing the entry of summary judgment. App. 41 & 129. The Court referred the matter to Magistrate Judge Giselle Lopez Soler for an R&R. App. 489 After considering the parties submissions and the applicable law, Magistrate Lopez recommended that the Court grant Ithier's motion for summary judgment. App. 489, 497. On September 30, 2022, the district court issued an Order adopting the R&R. App. 504. Judgment was entered on September 30, 2022. Addendum 12, App. 506. On October 25, 2022, defendant Aponte filed a timely notice of appeal from the district court's judgment. App. 507.

## V. SUMMARY OF THE ARGUMENTS

At issue in this case is who is a "featured artist" in the El Gran Combo sound recordings entitled to the royalties collected from digital performances and to be distributed pursuant to 17 U.S.C. § 114(g)(2)(D). Ithier argues that the only

featured artist is El Gran Combo and that as the owner and employer of the band, he is solely entitled to 45% of the royalties. Aponte argues that as a lead singer of El Gran Combo, he should be considered a featured artist under the statute entitled to share with Ithier the 45% of the royalties due to the artist.

The Digital Performance Right in Sound Recordings Act was passed by Congress in 1995 to amend the U.S. Copyright Act in 17 U.S.C. §§ 101 et seq. Pub. L. No. 104-39, 109 Stat. 336 (1995). It was signed into law on November 1, 1995, to provide copyright protection to sound recordings by including a new right for public performances of sound recordings by digital audio transmission. 17 U.S.C. § 106(6). Certain digital music services are now required to pay record companies and recording artists when they transmit sound recordings. Recording Industry Association of America v. Librarian of Congress, 176 F.3d 528, 530 (D.C.Cir. 1999). The law created a statutory license for those wishing to transmit the copyrighted work. SoundExchange, Inc. v. Muzak, LLC, 322 F.Supp.3d 72, 74 (D.D.C. 2018). This allows digital audio services to perform copyrighted sound recordings by paying predetermined royalties without having to seek separate permissions from copyright holders. SoundExchange, Inc. v. Copyright Royalty Board, 904 F.3d 41, 46 (D.C. Cir. 2018). The compulsory licensing regime is set out in Section 114 of the Copyright Act. SE is designated by regulation as the sole entity to collect royalties for digital performances under statutory licenses.

SoundExchange, Inc. v. Muzak, LLC, 322 F.Supp.3d 72, 75 (D.C. 2018). SE then distributes the proceeds among artists, musicians, vocalists, and copyright holders as outlined in Section 114(g)(2). Id.

The crux of the matter in this litigation is to determine whether defendant Carlos Aponte is, or is not, a featured artist under section 114 (g)(2). As a featured artist, Aponte would receive an undetermined portion of the 45% of the royalties, and as a non-featured artist, he would receive 2 1/2% of the monies collected. Aponte, in essence, argues in his Motion for Summary Judgment that, since he doesn't fit the definition of a session musician or background singer set forth by SE on its website as an example of a nonfeatured artist, he must therefore be a featured artist entitled to royalties under the law. The legal reasoning used by Aponte to reach this conclusion is flawed and unsupported. As we shall see, Aponte is simply an employed non-featured vocalist that sang for the main attraction El Gran Combo, the universally recognized featured artist.

After the final judgment was entered at the district level, Aponte turned the tables about the paramount issue in this case. Although Aponte stipulated that he is a separate Artist from El Gran Combo (App. 491. (R&R Uncontested fact 11), the appellant now concedes that El Gran Combo was the featured artist all along. Yet, still, Aponte should be considered a featured artist because he is a group member.

# VI. ARGUMENTS

**Aponte is a Non-Featured Vocalist Under Section 114**

The Copyright Act, 17 U.S.C. § 114, provides a statutory license that permits the digital performance and reproduction of copyrighted sound recordings. 17 U.S.C. § 114. As part of that license, Congress has established a specific statutory scheme to distribute royalties when copyrighted songs are performed or otherwise reproduced publicly by means of digital audio transmission. Id. According to Section 114, the Copyright Royalty Board designated SE, an affiliate of the Recording Industry Association of America, as the sole entity to collect royalties for those digital performances. Id.

Section 114(g)(1) and (2) are of utmost importance. Subsection (1)(A) states that:

> (A)  a featured recording artist who performs on a sound recording that has been licensed for a transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the artist's contract.
>
> (B)  a nonfeatured recording artist who performs on a sound recording that has been licensed for a transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the nonfeatured recording artist's applicable contract or other applicable agreement.

Thenceforth, under Section 114(g)(2), the royalties are distributed among the various artists, musicians, and copyright holders associated with a given song, as follows:

(A)    50 percent of the receipts shall be paid to the copyright owner . . .

(B)    2 1/2  percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.

(C)    2 1/2 percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to nonfeatured vocalists (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

(D)    45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording 17 U.S.C.A. §§ 114 (g)(2)(A)-(D);

Today, the "independent administrator" of said funds is the Screen Actors Guild-American Federation of Television and Radio Artists (SAG- AFTRA). This entity receives the royalties from SE and distributes those royalties to non-featured musicians and vocalists (collectively, "non-featured performers") pursuant to this statutory scheme.  Thereafter, SAG-AFTRA distributes royalties to non-Union non-featured performers and non-featured performers who are Union members. Risto v. Screen Actors Guild- American Federation of Television and Radio Artists, 2:18-cv-07241 –CAS-PLAx (C.D. Cal. June 14, 2021), See also, Nimmer on Copyright, Sec. 8.22[C][4].

9

SE also administers statutory licenses for sound recording copyrights, primarily through collecting and distributing royalties for sound recording performances under federal law jurisdiction. It operates, in part, pursuant to Copyright Office regulations set forth in 37 C.F.R. Parts 370, 380, 382, 383, and 384.

SAG-AFTRA is empowered to determine the nature and amount of payments that are distributed to non-featured performers. SAG-AFTRA collects data helpful for identifying and locating artists eligible for remuneration. Presently, the most widely used element to identify the featured artist for payment is the information encoded in the sound recordings. 17 U.S.C. Section 114 (2)(A)(iii). If you are not encoded as a featured artist, you can be eligible for the payment as a non-featured performer only, if the person has entered a contract with the record company who usually owns the sound recording and agrees to pay the non-featured artist (usually in the form of an assent and guarantee covenant), or if the featured artist has entered an agreement with a non-featured performer in the sound recording allowing for the right to participate in royalty payments based on the exploitation of the sound recording. 17 U.S.C. Section 114 (B) Eligibility for payment, (A)(i).

The performer and track information provided by the Unions is also derived from records that have been collected, compiled, and maintained as part of a

large-scale, ongoing effort by the Unions over the course of decades. The Union's records are also derived from session reports (also termed "B-forms"), containing identifying information for some or all the non-featured musicians and vocalists who performed at the reported sessions. Non-featured vocalists have been certified as a class under Section 114(g)(2)(b-c) in a class-action suit that was filed against SAG-AFTRA. See <u>Risto v. Screen Actors Guild-American Federation of Television and Radio Artists</u>, supra.

The SAG-AFTRA web page is in perfect pitch with the Risto classification. Said electronic address divides the non-featured performers into two categories: non-featured musicians and non-featured vocalists. Likewise, the SAG-AFTRA fill-out form (downloadable to the non-featured artist) only refers to non-featured vocalists. The term background singer or singer is nowhere in the form either.

"The Supreme Court has repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a statute or regulation has a plain and ordinary meaning, courts need to look no further and should apply the regulation as it is written." <u>Textron, Inc. v. Comm'r</u>, 336 F.3d 26, 31 (1st Cir. 2003), <u>Bonneville Intern. Corp. v. Peters</u>, 347 F.3d 484, 491 (3d Cir. 2003) (the first step of statutory construction is the statute's text). The circumstances under which a court looks behind the plain language of a statute are extremely limited. Limited only to "rare cases [in which] the literal application of a statute will produce a result

demonstrably at odds with the intentions of the drafters." <u>Griffin v. Oceanic Contractors, Inc.</u>, 458 U.S. 564, 571, 102 S. Ct. 3245, 73 L.Ed.2d 973 (1982), or where the plain meaning will result in an absurd outcome, <u>Textron</u>, 336 F.3d at 31 (citing <u>Sullivan v. CIA</u>, 992 F.2d 1249, 1252 (1st Cir. 1993)). The dearth of legislative history is not a carte blanche to narrow or expand Section 114 applicability. <u>Bonneville Intern. Corp.</u> at 499. A statutory construction of Section 114 may include examining other sections of the statute to ascertain its meaning by analogy. <u>Bonneville Intern. Corp.</u> at 495-497.

As obliged by adjudgment methodology, we must first determine whether Aponte's performances in the El Gran Combo sound recordings fall under the copyright definition of a featured artist. The act does not explicitly define what a featured artist should be. Nonetheless, the statute does refer to the existence of non-featured vocalists and how these performers should be remunerated. As we've seen, under Section 114 (g)(2)(b-c), a non-featured vocalist is entitled to receive 21/2% of the 5% set aside to pay for non-featured artists.

The Merriam-Webster dictionary defines featured as: "displayed, advertised, or presented as a special attraction." See Merriam Webster web page; https://www.merriam-webster.com/dictionary/featured.   SE, which pays out the royalties to the featured artists, establishes that a featured artist can be an

individual duo or group. Also, SE's guide to keywords on the website explains that "an artist is a group, band or individual name as it appears on the recording."

If we focus on the sound recording album covers, El Gran Combo is unmistakably the main attraction and therefore the featured artist. Aponte is quick to admit that his name has never been featured on an album cover of El Gran Combo and that El Gran Combo is the only name he has ever seen on the front cover of an album of the orchestra. Likewise, Aponte acknowledges that El Gran Combo and Charlie Aponte are two different Artists. More to the point, as a solo act, Aponte receives separate payment as a featured artist from albums recorded after he left El Gran Combo in 2014.

If we construe the statute under the plain meaning rule doctrine, the term non-featured vocalist is a singer in a solo act, band, duo, or group who is not the principal or main act recorded in an album. In other words, a vocalist that is not considered the main attraction in the album recording. We need to look no further for an explanation in the case at bar.

The foregoing establishes beyond per adventure that Aponte is not a featured artist under Section 114. Is he a non-featured artist? Absolutely! Defendant's trenched legal theory to refute this conclusion is that since Aponte does not fall squarely under the category of a session musician or a background singer as

defined by SE, he must therefore fall into the category of a featured artist. The reasoning behind this argument is specious and lacking articulation.

First, the definition appearing on SE's web page was most likely intended as an example. App. 495. It is not dispositive of the issue at hand because it was not even a term used by the drafters of the Section 114 statutes. As per the act, the only phrase used in Section 114 fitting Aponte is that of a non-featured vocalist. Second, the defendant's deductive reasoning is flawed because it parts from a faulty premise. It doesn't allow the plausibility of a band or orchestra as a featured artist if it has a vocalist as a lead singer, even if the singer is not the featured artist. That is in stark contrast with Section 114 (g)(2)(A-D)'s wording which makes specific reference to the existence of a non-featured vocalist in diaphanous language and without any limitations. If the statute is read plain and straightforward, Aponte can only fall into two categories. He is either a featured artist, or he is not. Since Aponte is not a featured artist, he must fall under one of two non-featured artist sub-categories. Thus, Aponte must be either a non-featured musician or a non-featured vocalist. He falls into the latter category because he is a singer. This interpretation is in syntony with the statute's plain language. Furthermore, this statutory construction is consistent with the terms commonly used in industry practice as we shall elucidate later.

The operative facts of this case support this conclusion also. It must be borne in mind, that Aponte has referred to himself as a non-featured artist when placed in the context of an album cover. Aponte's past fellow employee and band member Jerry Rivas agrees with this assessment. Rivas stated that Aponte has never been advertised as the main attraction in any of the albums released and recorded, or for any other purpose while he was an orchestra member. App. 161-162. So, whether Aponte is, or is not, a background vocalist or a lead singer is irrelevant to the determination at hand simply because we know Aponte does not fit into the featured artist category and only fits into the non-featured vocalist one.

Furthermore, the internal contractual relationship between Aponte and Ithier should be the central focus of the featured artist's inquiry because it is the deciding factor and thus, dispositive of the featured artist issue. Aponte and SE argue that the Appellant is entitled to the royalties as a member of El Gran Combo. In spite of this, the claim is without merit because it does not consider that the vocalist has contractually renounced any royalty payments and has acknowledged that he has no rights over El Gran Combo. App. 150, (PSUMF 10), 152 (PSUMF 19) 153, (PSUMF 31, 32). Additionally, Aponte signed an EGC Inc. employee manual accepting his status as an employee. Addendum 1 As his employer, Ithier could replace Aponte at will. App. 153, (PSUMF 32, 34) Aponte has never argued that he entered a partnership with Ithier as a band member. He was hired to perform in

sound recordings for the band's sole owner. See App. 504-503 Docket 40. As such, Aponte's admitted employee status in El Gran Combo is akin to a session musician or non-featured vocalist under 114. That is the reason why Aponte conceded that the only individual entitled to royalties of any kind is Ithier, who possesses sole authority to sign recording contracts or allow for payment of royalties to band members.

SE's insistent reference to Ithier as a manager belies the stipulated, adjudged, and undisputed fact that Ithier is the group's owner, the founder has no partners, and the employer of all the musicians in the band. App. 504-503 Docket 40. A manager usually does not own any rights over a band. We seriously question the plausibility that managers are likely to claim 114 royalties as featured artists if the district court is confirmed as SE presages in the Amicus Brief unless these managers are also the group's owner. See Scholz v. Goudreau, 901 F.3d 37 (1st Cir. 2018) (where former founding partners-owners of the band called Boston determined via a settlement the distribution of performance royalties.)

SE's Eagles featured artist distribution illustration is possibly the worst example to show how the distribution of royalties should be among partners, owners, or group members. In the Eagles' case, original partners and owners Henley and Frey determined who and what they were paid. See Andrew Vaughan, The Eagles: An American Band, Published by Sterling Publishing Corp., (2010) at

16

10, 258 (ISBN 1402777124). The Eagles' internal quarrels for creative and economic control between partners and band members are legendary. After "Don Felder was sacked from the Eagles" by Frey and Henley in 2001, Felder filed suit alleging that after the reunion he should have been an equal financial partner. Id. at 258; See also, Don Felder's, Heaven and Hell: My life with the Eagles, Turner Publishing Co. (2007).[1] The aforesaid is the reason why SE policies or interpretations with regard to digital performing rights should have no bearing on what co-owners or partners decide to do with their respective rights.

As we have seen, analyzing the contractual business relationship between the parties is paramount before we put any performer on the featured artist bandwagon. To award the right to royalties as a featured artist simply because a person performs in a band does not work in all cases, or at the very least in Ithier's situation. A featured artist claim must not be considered *in vacuo*. That is why the Appellant's and SE's one size fits all featured artist panacea fails. The litmus featured artist test offered by Appellant and *amici* is unsound and further complicates the digital performing royalties distribution operation. The analysis

---

[1] The partnership wars were somewhat settled after 2012 when Glenn Frey and Don Henley, as the remaining founders and partners of the Eagles (the owners), basically took control over who was permitted into the partnership or group and their compensation from whatever sources of income until Frey died in 2016. See VCR Classic Rock and Culture web page, https://ultimateclassicrock.com/eagles-lineup-changes.

must be put in the context of the contractual scenario. This intricate multifactorial inquiry is likely why SE has instituted a mediation detour to disputes under section 114, reaffirming that the featured artist saga is best dealt with on a case-by-case basis.

If we apply these principles to this case, being part of a band as an employee does not give Aponte a right to recover royalties as a featured artist. Yes, Aponte's employment made him a part of the band and performer in the sound recordings, but that fact alone does not make him a co-owner of El Gran Combo or Ithier's partner. The vital question to be made is whether Aponte possesses any interests as a partner, co-owner, or employee of El Gran Combo that would allow him to claim royalties as a featured artist. *A fortiori*, if we apply the same principles behind 17 U.S.C. § 114(g)(1)(A), which require the copyright owner of the recording to agree in advance that the non-featured artist performer is entitled to receive royalties under a recording contract.

### Aponte's Personal Claim to featured Artist Royalties under (Section 114(g)(2)(D)

Further exegesis under this section requires a brief recapitulation of the law and operative facts. The Digital Performance Right in Sound Recordings Act of 1995 specifies that a "featured artist" must perform "on a sound recording." 17 U.S.C. § 114(g)(1)(A). The statute, however, makes a distinction between

nonfeatured musicians and nonfeatured vocalists (Sections 114(g)(2)(B) and (C)) and featured artists (Section 114(g)(2)(D)) for purposes of the distribution of royalties under the statutory licensing provision. Under Section 114(g)(2)(D), the term "artist" is used to make general reference as to who is entitled to royalties as recording or featured artist on the sound recording. Sections 114(g)(2)(B) and (C) are specific as to musicians and vocalists being entitled to the 2½ royalties as nonfeatured musicians or nonfeatured vocalists.

The litigants in the case have agreed to consider El Gran Combo and Aponte as two distinct and separate artists. Aponte has admitted that his SE claim was as an independent artist, not as a member of El Gran Combo. His principal claim at the district level was that Aponte was an individual with a right to the featured artist's royalties. Aponte never sought a declaration conceding that El Gran Combo was the sole featured artist as he does now. Contrarywise, Aponte wanted to add his name to the featured artist list in his own right entitling him to split with El Gran Combo 45% featured artist royalties. Aponte's counterclaim doesn't even mention that he wants royalties as a member of the featured artist group. App. 028. The claim for royalties as a group member first appears in Aponte's Summary Judgment Motion in a perfunctory manner.  Up to that point, Aponte still alleged he was to be considered a featured artist in search of a more significant piece of the royalty pie. It is not after he sees a dead-end street sign in the form of a Report and

Recommendation that he decides to change directions and allege that he has a right to royalties as a member of the featured artist El Gran Combo. Aponte goes so far as to state in his reconsideration that the district court misconstrued the question in an astounding reversal from their dispositive motion arguments.

At the appellate level, the switcheroo plot has thickened. Aponte, together with *amici* SE now argue that El Gran Combo was the featured artist all along, but that Aponte has a right to royalties as a past member of the group the featured artist. Nonetheless, as we have discussed, being an employed band member does not give him the right to royalties because he is an employee of Ithier, as the court concluded, and Aponte admitted. App. 504, Order 37 adopting R&R (Docket 40). After examining the R&R and conducting *a de novo* review of the record, the district court coincided with this view. It specifically stated that the R&R "was supported by both the facts and the law because El Gran Combo, organized as a corporation, is a distinct legal entity that employs the musicians that compose the band. As the group most prominently featured on the sound recordings, the corporation is entitled to collect royalties as the featured artist and Plaintiff is the sole owner of that corporation." App. 505 Order 37 adopting the R&R.

SE foreshadows a doomsday scenario if the court of instance is affirmed. We differ. For starters, assertions made by SE are simply unplausible or hard to believe. They are not backed up with empirical data and are against the music

20

industry's usage and customs. The prevailing view in the industry is that owners or employers of musicians in a band do not pay artists Section 114 featured artist royalties to session musicians or employees.   As three-time Grammy Award winner and Expert Cucco Peña asserted in his deposition:

> "In the music industry, groups change singers and musicians, and musicians and singers change groups often. ...The "Brand" has always been the group's name, with whomever the singer and musicians are at the time....
> The only exception occurs when the name of the orchestra or group carries the name of the singer or owner, as in 'Tito Rodriguez and his Orchestra", "Cortijo y su Combo", "Willy Rosario" or "Tommy Olivencia".   Then, whoever's name is marketed and headlines records, contracts and promotions, is the "Featured Artist". The owner is the one who will decide what the employees will be paid, and in the case of Sound Exchange, who shall be granted Featured Artist compensation if any. Aponte was not featured in any special way in any of the album covers or promotions, not by the use of his name, or by the use of a different uniform or position than all the other musicians and singers in the group. El Gran Combo is a one of a kind group. It is often called "La Universidad de la Salsa" (The University of Salsa) in all Latin America. It is possibly the biggest name today of any musical salsa group in the world and as such, has never depended on, or featured any other name than it's own. Singers and musicians have changed during this sixty years since its foundation, but the brand is still as strong as ever. App. 159 (PSMUF 81)

Peña supports his featured artist's conclusion further with these final thoughts:

> "When people hear a recording, watch a video or attend a performance by El Gran Combo, they recognize El Gran Combo as the featured artist. The fact that Carlos Aponte is the lead singer in many of the songs played by El Gran Combo does not make him the featured artist. El Gran Combo was the featured artist before Aponte

became one of the singers and has continued to be the featured artist after Aponte left the group. Simply put, El Gran Combo is and always has been the principal artist with or without Aponte. The featured artist, then, is not the singer, unless he owns the group, his name is the one advertised and contracted, and he handles all responsibilities. The featured artist is the group, whose name is the constant marketability." App. 159-61 (PSMUF 82, 83)

SE believes that affirming the district court decision will lead to statutory claims from managers of groups who are not recording artists. In our view, the effect would be quite the opposite. The industry would turn upside down if this court instilled a rule of law that would entitle any performer in a sound recording to receive featured artist royalties irrespective of the factual contractual reality of that vocalist with the band's employer or owner. A reversal could even be interpreted as a partial revocation of *CCNV v Reid* pronouncements and its prolific progeny. Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989). A precedent like SE proposes would send an expansive nuclear wave that would cause a 49'ers gold rush-like chaos at the SE gates. We can't even begin to fathom the hundreds of thousands of non-featured artists requesting SE and SAG-AFTRA a reclassification of their royalty claim as featured artist. This would oblige SE to sue for a refund of payments already made to band owners and employers to avoid liability. This leaves no doubt that a district court judgment reversal would lead to an absurd result.

Likewise, a decision like the one recommended by Appellant and SE would turn into shambles the principle of contractual autonomy. Employers and group owners would not be able to bargain and create the terms of the agreement they desire.   A court determination like the one sought by SE, would nullify the consequences of bilateral obligations freely negotiated between an owner and a musician who was voluntarily willing to give up certain rights or remedies for his employment. <u>Otero-Burgos v. Inter American University</u>, 558 F.3d 1, 6 (1st Cir. 2009). For example in this case Aponte knew from the moment he was hired to sing in El Gran Combo that as an employee he did not have a right to royalties as a partner or owner.

**El Gran Combo is the "featured artist" under Section 114(g)(2)(D), even if Aponte is a performing band member**

Aponte posits that all band members are automatically featured because only humans can perform music. Aponte's argument regarding the definition of the action to "perform" under the U.S. Copyright Act is flawed. As the district court correctly observed, taking that definition literally and inserting it into Section 114 would exclude the band as a potential featured artist. This would ignore "the explicit distinction that Section 114(g)(2)(D) makes when it uses the term "artist" rather than musicians or vocalists to refer to those that may be featured." App. 495, R&R p.7. If this were the case, "the sections of the statute that provide for the payment of royalties to nonfeatured musicians and nonfeatured vocalists would be

superfluous, at least as these relate to El Gran Combo." App. 495, R&R p.7. Furthermore, "under Aponte's logic a band alone (that is, the owner of the band) would never be entitled to the royalties under Section 114(g)(2)(D) regardless of whether the band is the only featured artist." App. 495, R&R p.7. [2]

The text of Section 114(g)(2)(C) does not exclude vocalists (e.g., lead singers) in the "nonfeatured vocalist" group. Again, as the district court reasoned, one cannot assume "that Congress's use of the term "nonfeatured vocalists" in Section 114(g)(2)(C) was intended to exclude lead singers." This is so because a lead vocalist, whether featured or not, is still a vocalist under Section 114(g)(2)(C). Accordingly, Aponte fits squarely under Section 114(g)(2)(C) with a right to royalties as a nonfeatured lead singer. Given the court's *desiderata*, it is evident that SE got it wrong when it defined session musicians or backup vocalists as the only performers fitting the definition of "nonfeatured artists." Besides, SE's interpretation of 114(g)(2)(C) has no bearing in this litigation because "the statute does not grant rulemaking authority to an agency, but merely charges "a nonprofit collective designated by the Copyright Royalty Judges [i.e. Sound Exchange] to distribute receipts from the licensing of transmissions." 17 U.S.C. § 114(g)(2).

---

[2] This result would be wholly inconsistent with the purpose of the amendments set forth by the Digital Performance Right in Sound Recordings Act of 1995; to grant performing artists, record companies, and copyright owners of sound recordings digital audio transmission performance rights, including the right to receive the payment of royalties on account of the statutory licenses created by the statute. See S. Rep. 104-128 (1995) at p. 357 (emphasis added).

The Digital Performance Right in Sound Recordings Act of 1995's legislative history also supports the court's *ratio dicidendi*. Congress' analysis of the "featured recording artist" term, as used in another subsection of Section 114, is most relevant here:

> The term "featured recording artist" means the performing group or ensemble or, if not a group or ensemble, the individual performer, **identified most prominently in print on, or otherwise in connection with, the phonorecord actually being performed**. Except in the case of a sound recording consisting of a compilation of sound recordings by more than one performer or group or ensemble, **there will ordinarily be only one "featured recording artist" per phonorecord. A vocalist or soloist performing along with a group or ensemble is not a "featured recording artist" unless that person is identified in connection with the phonorecord as the primary performer.** For example, the Eagles would be the "featured recording artist" on a track from an Eagles album that does not feature Don Henley by name with equal prominence; but if the same sound recording were performed from "Don Henley's Greatest Hits," then Don Henley and not the Eagles would be the "featured recording artist." Where both the vocalist or soloist and the group or ensemble are identified as a single entity and with equal prominence (such as "Diana Ross and the Supremes"), both the individual and the group qualify as the "featured recording artist." S. REP. 104-128, 36, 1995 U.S.C.C.A.N. 356, 383.

This same explanation was included in the Proceedings and Debates of the 104th Congress, First Session dated August 8, 1995. 141 Cong. Rec. S11945-04 at S11956-S11957 (1995). Per the prior clarification, singers such as Aponte may be featured recording artists only if featured; otherwise, only the band would be the featured recording artist. There is no dispute that the band El Gran Combo was the artist "most prominently included in print on, or otherwise in connection with,

the phonorecords performed." Aponte's name was not featured on album covers or promoted as the main attraction for live audiences. There is nothing to conclude that El Gran Combo and Aponte were featured by name with equal prominence. Consequently, as per the legislative history, the conclusion is inescapable. The band El Gran Combo (and, therefore, its owner) is the artist featured in the El Gran Combo sound recordings entitled to 45% of the proceeds of royalties as outlined in 17 U.S.C. § 114(g)(2)(D).

Any further statutory construction beyond this point would focus on a smoke and mirrors magic act that fictitiously turns a non-featured vocalist into a featured artist due to a SE definition mistake. Arguments requiring performing humans on sound recordings are, at the very least, of very little use to define what a featured artist or a non-featured vocalist was intended to be by the statute's pristine, and plain language. As the term is used in Section 114, it does not exclude the possibility of a vocalist performing in a group as a non-featured performer. If SE desires to change the statute to exclude employers or owners from the right to claim featured artist royalties, it must do so by requesting an amendment to Section 114 as it applies to featured artists. Baker v. United States, 27 F.2d 863 (1st Cir. 1928) SE's interpretation of Section 114(g)(2)(D), even if it were a newly adopted rule, would be void because agency regulations or pronouncements that contradict the terms of a governing statute exceed the

SE's authority. Miller v. Sunapee Difference, LLC, 308 F. Supp. 3d 581 (D.N.H. 2018); Whitehouse v. U.S. Dist. Court, 53 F.3d 1349 (1st Cir. 1995) ("federal district courts cannot effect substantive changes in the law through local rulemaking."). Under the previous analysis, it is evident that Aponte's entire case is clinging to a SE mistaken interpretation of the law that exceeded the entity's authority and role.

As we've seen, SE transfers to SAG-AFTRA 5% of the licensing funds collected so it can be distributed to non-featured artists. To resolve the issue posed here, all one needs to do, is to see the criteria used by SAG- AFTRA for paying the non-featured artists. App. 158-159 (PSMUF 68-76) The SAG-AFTRA welcome page guides you to three sections of the website entitled "Do You Have Royalties." One of the choices given by the Union web page is specifically intended for "Featured Musicians and Vocalists." App. 158-159 (PSMUF 68-76) Non-featured singers, like Aponte, without a right to claim royalties over the recordings, are among the various artists SAG-AFTRA is paying as a non-featured vocalist. As evidenced, Aponte does not have to be categorized or branded as a session musician or background vocalist to be entitled to these monies. Aponte fits perfectly under Section 114 (g)(2)(C) as a non-featured vocalist employed to perform in a group, in this case, called El Gran Combo. Ironically, all Aponte

needs to do to collect his royalties is to fill out the AFTRA-SAG form as a non-featured vocalist. He has had those royalties in the palm of his hands all along.

## VII. CONCLUSION

Overall, Aponte is undeniably a non-featured vocalist who once sang for El Gran Combo as an employee. Aponte does not have a right to collect royalties under Section 114(g)(2)(D) as a featured artist. To collect his royalties, Aponte needs only to access SAG-AFTRA's web page and hit the non-featured vocalist option that will guide him to his royalty pot.

The District's Court Judgment should be Affirmed.

**WHEREFORE,** Appellee requests that the Court of Appeals affirms the District Court's Judgment declaring that Plaintiff as the sole owner of the artist most prominently featured on the sound recordings and employer of the musicians that compose the band El Gran Combo, is entitled to collect royalties as the featured artist under 17 U.S.C. §114(g)(2)(D).

**RESPECTFULLY SUBMITTED.**

This February 1, 2023

s/Roberto Sueiro Del Valle<br>
Counsel for Appellee<br>
First Cir. Bar No. 6732<br>
USDC-PR No. 207801<br>
Tulipán 170 Urb. San Francisco<br>
San Juan, PR 00927-6221<br>
Tel.: (787) 753-4712<br>
E-MAIL: rsdv@me.com;<br>
sueirolaw@me.com

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,022 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac v.16.68 in 14-point Times New Roman.

3.      The undersigned understands that a material misrepresentation in the certificate may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

s/ Roberto Sueiro Del Valle
Counsel for Appellee

Dated: February 1, 2023